THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JACK MITCHELL, Appellant.

Second Department, September 18, 1978

### APPEARANCES OF COUNSEL

*Richard M. Gardella* for appellant.

*Carl A. Vergari, District Attorney (Anthony Joseph Servino* and *Cheryl K. Kosan* of counsel), for respondent.

### OPINION OF THE COURT

MOLLEN, P. J.

Defendant was indicted for the crimes of common-law murder, felony murder (committed during the course of a robbery), robbery in the first degree, petit larceny, two counts of burglary in the second degree and two counts of criminal possession of a weapon as a misdemeanor. All of those charges arose out of the killing of Claude Brownshield on August 25, 1976 while he was in his room at the Y.M.C.A. in White Plains.

After a jury trial the defendant was convicted of felony murder and two counts of burglary in the second degree. The jury returned a verdict of not guilty on the counts charging common-law murder and robbery in the first degree. (Pursuant to the court's instructions, the jury did not consider the charges of petit larceny and the two counts of criminal possession of a weapon as a misdemeanor.)

Subsequent to the trial the defendant moved to set aside the jury's verdict contending that the evidence was legally insufficient to sustain his conviction on any of the counts of the indictment and also arguing that the verdict finding him guilty of felony murder and acquitting him of robbery was repugnant. The trial court denied the motion.

The two decisive questions which are presented for our determination on this appeal are whether:

(1) the evidence, circumstantial in nature, was sufficient to establish the defendant's guilt beyond a reasonable doubt of the crimes of felony murder and two counts of burglary in the second degree; and

(2) the jury's verdict, convicting the defendant of felony murder and acquitting him of the underlying felony (robbery in the first degree), is repugnant.

At the trial the prosecution sought to prove that on the evening of August 25, 1976 the defendant, while burglarizing the deceased's room, forcibly stole a stereo set and, in the course of and in furtherance of the robbery or in the immediate flight therefrom, killed the deceased.

In considering the defendant's first contention it is necessary to review the evidence in some detail.

On May 25, 1976 the deceased purchased an AM/FM receiver, a stereo and two speakers from an appliance store in White Plains. The stereo was placed upon a table in his room (No. 566) at the Y.M.C.A. In the beginning of August, 1976, while the deceased and his friend, Charles Hayes, were in the snack bar of the "Y", the defendant approached them. The defendant told Browshield that he wanted to buy his stereo and he offered to pay approximately $200 for the set.

On August 18, 1976, at approximately 9:30 P.M., the defendant met Benjamin Somma and Linda Sabbarese as the two of them were standing on a street corner in White Plains. The defendant told Somma that there was a person named Brownshield at the "Y" who had a stereo and some money whom he wanted to set up and "rip-off"—rob. Somma stated that he did not want anything to do with the proposed robbery.

On August 25, 1976, at about 5:30 P.M., Hayes and the deceased left the snack bar at the "Y" and went to a department store to purchase a few items. However, at approximately 6:15 P.M., they became separated and Hayes never saw Brownshield again.

On that same evening, at approximately 8:30 P.M., Benjamin Getter was sitting on a wall in front of the "Y" when the defendant came out of the building and called him over to the side. The defendant asked Getter if he wanted to purchase a stereo but Getter answered in the negative. The defendant then inquired if Getter could sell it for him in New York.

When Getter replied that he could, the defendant asked him if he would go to New York with him. Getter refused and suggested that the defendant take it to a pawn shop. The defendant responded that he could not do that. Getter did not see any blood on the defendant's T-shirt, his hands or his dungarees. The defendant did not have a stereo set with him during the course of the conversation, nor did he describe any particular stereo set to Getter. Getter was certain about the time that the conversation took place since he made a telephone call that evening at 9:00 P.M.

On August 26, 1976, at approximately 9:15 A.M., the cleaning woman at the "Y" knocked on the door to Brownshield's room but received no reply. She then used her key to unlock the door. When she opened the door she saw a body lying on the bed with the feet hanging limp. She immediately contacted her superior and the police were then summoned. The police responded almost immediately and upon entering the room they found the deceased lying on his back on the bed with his shoeless feet hanging over the end of the bed. The deceased's left hand covered his side and his stomach, and a white plastic bag was pulled very tightly over his face. A puncture wound was discovered on the left side of the body. A search was made but no weapon could be found. A dusting for latent fingerprints also proved to be negative. The stereo set was missing from the deceased's room. It was last seen in his room by his brother James on Sunday, August 15, 1976.

At approximately 10:15 A.M. the Deputy Medical Examiner, Doctor Gary Paparo, arrived at the scene. After examining the body he ruled that it was a homicide and approximated the time of death at 8 to 10 hours prior to the discovery of the body. At approximately 1:00 P.M. the same day, an autopsy was conducted by Doctor Louis Roh, the Associate Medical Examiner. The autopsy disclosed a stab wound in the chest five eighths of an inch in length with a track two and one-half inches long. Doctor Roh also found indications of asphyxiation which was caused by manual strangulation. He approximated that death occurred in the late evening of August 25, 1976, within one to two hours after the deceased had eaten his last meal. Testifying further he stated that when he performed the autopsy rigor mortis had already set in and that it takes 12 to 15 hours before that condition occurs. Consequently the decedent died 12 to 15 hours prior to his autopsy, which would fix

the time of death between 10:00 P.M. and 1:00 A.M. on the morning of August 26, 1976.

At approximately 6:30 P.M. on August 26, 1976, Lieutenant Smith spoke to Hayes at the "Y" and, as a result of that conversation, inquired about the occupant of room 562 (the defendant). Lieutenant Smith secured a key to that room and entered it with other police officers. A brief search was made and Lieutenant Smith discovered an envelope in the toilet which was torn in half with yellow lined paper protruding from the halves. He retrieved it from the bowl and placed it on the tank. The police officers then left the room.

Later that evening a second search of the defendant's room was conducted by police officers and the defendant's parole officer, Sidney Garber. Garber testified that the defendant was supposed to meet with him on that day but that the defendant had failed to appear for his appointment.

During the second search the envelope with the paper that was found in the toilet, a pair of blood-spotted jeans, a pen knife with a two and one-half-inch-long blade which was found in the pocket of the jeans and a pair of shoes were seized. The envelope was addressed to the deceased and had been mailed to him by his mother on Sunday August 22 because August 23 was the deceased's birthday.

Lieutenant Smith returned to police headquarters where, at approximately 9:30 P.M., he received a telephone call from Getter who informed him that he had an idea that the stereo set was missing and who had it. Lieutenant Smith subsequently met with Getter and had a conversation with him.

On August 27, 1976 an anonymous telephone call was received at police headquarters concerning the death of Brownshield. As a result of that telephone call two detectives were directed to proceed to the "Y" to interrogate Somma, the occupant of room 552. During the course of the telephone conversation the police were informed that Somma was attempting to sell some item. At approximately the same time that the police were conducting their investigation of Somma's room, Lieutenant Smith was continuing his investigation on the same floor at the "Y". The linen maid knocked on the door to the defendant's room and received no response. She then opened the door. At that time Lieutenant Smith looked into the room and saw the defendant lying on the bed. He jumped up from the bed and identified himself as Jack Mitc-

hell. He was then advised of his rights and taken to police headquarters.

An expert witness testified that she tested several areas on the knife that had been found in the defendant's room on August 26, but did not find any blood present. The two areas on the jeans which she examined proved positive for the presence of blood, but she was unable to determine whether it was human blood because the amount of blood present was too small to permit her to do the necessary testing.

After the People rested the defendant presented two witnesses. The first witness, the night clerk at the "Y", testified that on August 27, 1976, at approximately 6:30 A.M., the defendant came to his desk and stated that someone had entered his room and that it might possibly have been ransacked. Arlene Kolb, a registered nurse who worked in the emergency room at the White Plains Hospital, testified that on August 22, 1976 an individual by the name of Jack Mitchell had received 24 stitches in his upper left arm. The witness had no independent recollection of the treatment rendered, but stated that the hospital records so indicated.

■ Since the defendant's first contention concerns itself with the sufficiency of the circumstantial evidence, we have viewed the facts most favorably to the People (see *People v Cleague,* 22 NY2d 363, 366; see, also, *Noto v United States,* 367 US 290, 296). We have assumed that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it. Nevertheless, it is our view that the evidence is legally insufficient to establish that the defendant was proven guilty beyond a reasonable doubt of the crimes of felony murder and burglary in the second degree and consequently those counts of the indictment must be dismissed (CPL 470.20, subd 2).

■ The People's case against the defendant consisted entirely of circumstantial evidence. Circumstantial evidence is evidence of a collateral fact, that is of a fact other than a fact in issue from which, either alone or with other collateral facts, the fact in issue may be inferred. (Richardson, Evidence [Prince, 10th ed], § 145). In order to sustain a conviction which is based entirely upon circumstantial evidence the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them, and the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence. *(People v Lagana,* 36 NY2d 71; *People v Benzinger,* 36 NY2d

29; *People v Williams,* 35 NY2d 783; *People v Borrero,* 26 NY2d 430.)

██ When viewed in its entirety the evidence in the instant case does not overcome the danger in the use of circumstantial evidence which was noted in *People v Cleague* (22 NY2d 363, 367, *supra):* "The danger, therefore, with the use of circumstantial evidence is that of logical gaps—that is, subjective inferential links based on probabilities of low grade or insufficient degree—which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference."

The central inference in this case is drawn from a presumed fact—that the defendant was in the victim's room on August 25, 1976—because a torn envelope addressed to the victim and mailed to him on August 22, was found in the toilet bowl of the defendant's room on August 26. The People incorrectly argue that it must be presumed that the envelope had been taken from the deceased's room because it was addressed to him. The record contains no proof that the envelope was ever in the victim's room. There is no proof as to the manner in which the residents of the "Y" received their mail—whether it was delivered to each individual resident's room or whether it was picked up at the main desk. In either event, the envelope could have been erroneously delivered to the defendant's room or, if picked up at the desk, given to the defendant by mistake. It is also possible that the deceased was visiting in the defendant's room and left the envelope there before he exited the defendant's room.

Absent the envelope, there is no evidence which would tend to place the defendant in the deceased's room on August 25. The blood specks which were found on the defendant's jeans could not be determined to be human blood.

Another presumed fact is the time that the deceased died. Both medical examiners made wide-ranging estimates of the time that death occurred. Doctor Paparo fixed the time of death at approximately 11:00 P.M. August 25, 1976 to 1:00 A.M. August 26, 1976. Doctor Roh stated that death occurred within one or two hours after the time that the deceased had eaten dinner. The record however contains no proof that the victim ate at 6:30 P.M., as the People sought to prove (or at any other time). Doctor Roh approximated the time of death to be between 10:00 P.M. August 25, 1976 and 1:00 A.M. August 26, 1976.

The missing stereo set leads to a further presumed fact.

Since the stereo set was not in the deceased's room following the discovery of his body, it is presumed that it was taken at the time he was killed. This is pure speculation. The record contains no proof that it was in the victim's room the day he was killed or the day prior thereto. Furthermore, the record is barren of any proof that it was not in the room after the killer left and that it was not taken by someone else at a later time. The only testimony as to the time when the stereo set was present in the victim's room came from the deceased's brother, who stated that he saw it in his brother's room on August 15, 1976.

Placed against the foregoing facts, the testimony from Getter loses most of its value. According to the estimates of Doctor Paparo and Doctor Roh, the deceased was still alive at the time that the defendant spoke to Getter concerning the sale of a stereo set. Additionally, the record does not contain any evidence that the deceased's stereo set was in his room that day or at any day subsequent to August 15, 1976.

The pen knife which was found in defendant's jeans leads to the further presumed fact that this was the knife which the defendant used when he killed the deceased. The pen knife, which did not contain any traces of blood or fingerprints, was not proven to have been the only pen knife in the 208 rooms contained in the "Y"; nor was it proven that it was the only two and one-half inch blade contained in the building. The record is absolutely devoid of any evidence showing that this knife was used in the slaying—the only connection being that the depth of the cut was the same as the length of the blade.

Passing now to the defendant's conviction for burglary in the second degree, the testimony was that the deceased's room was fairly neat and there were no signs of a forced entry; nor were there any signs of a ransacking. The testimony also indicated that the victim's door automatically locked when it was closed. There was no testimony that the defendant had a key to the deceased's room. The record also failed to contain any evidence to show that the defendant was physically present in the deceased's room and that if he was in fact present in the room that the deceased ordered him to leave.

In order to sustain a conviction for burglary in the second degree the People must prove beyond a reasonable doubt that the defendant "knowingly enter[ed] or remain[ed] unlawfully in a building with intent to commit a crime therein" (Penal Law, § 140.25).

In our opinion the evidence is legally insufficient to establish beyond a reasonable doubt that the defendant burglarized the deceased's room (see *People v Porter,* 56 AD2d 583; *People v Smith,* 39 AD2d 855).

While the foregoing analysis demonstrates the paucity of the proof as it relates to the defendant, examination of the other testimony as it pertains to some of the witnesses is also worthy of note. Upon cross-examination Hayes invoked his rights under the Fifth Amendment and refused to answer whether, on April 29, 1977, he had been found with $5,000 in his possession which had been stolen from a White Plains bank. He also testified that he was under the care of a psychiatrist at the time of the murder, failed to take his medication during the time that the deceased was killed and had been hospitalized for psychiatric diseases and problems, having been in an institution as recently as two years prior to the trial. He further testified, uncorroborated by any other evidence, that he went to his room at 7:00 P.M. on the night of the killing and remained there until the next day.

Addressing ourselves now to Somma's testimony, he admitted that he had been convicted in 1969 of burglary, in 1973 of robbery, and also of the crime of petit larceny. Additionally, he testified that on the night of the murder he was in his room at 8:00 P.M. when he received a phone call from his girl friend Sabbarese and, at some time between 8:30 and 9:00 P.M., he met her and that they drove around returning to the "Y" between 11:00 and 11:30 P.M. Additionally, he testified that he left the "Y" on August 27, 1976 at approximately 6:30 A.M. to go to Albany and that he had been arrested in Albany and returned to White Plains the same day.

Sabbarese, who corroborated the conversation that took place on August 18, 1976 among the defendant, Somma and herself, claimed that her only part in that conversation was to make the suggestion of putting some pills in the deceased's drink which would cause him to drop off thus making it easier to rob him. She further testified that she had been a heroin addict and at the time of the trial was attending a methadone clinic.

Additionally, she testified that on August 25, 1976 she picked Somma up near the "Y" at approximately 9:00 or 9:30 P.M. and that she dropped him off there at approximately 12:00 midnight.

Getter admitted that in 1973 he had been convicted of the

crime of assault and that on the day of the murder he was on parole. At the time of the trial he was still on parole.

In the instant case the hypothesis of guilt does not flow naturally from the facts proved and is not consistent with them; nor do the facts proved exclude to a moral certainty every reasonable hypothesis of innocence (see *People v Williams*, 35 NY2d 783, *supra; People v Cleague*, 22 NY2d 363, *supra; People v Sibblies*, 63 AD2d 934; cf. *People v Lagana*, 36 NY2d 71, *supra*). The evidence was, therefore, legally insufficient to establish the defendant's guilt of murder in the second degree and burglary in the second degree and these counts of the indictment must be dismissed (see CPL 470.20, subd 2).

■ Turning now to the defendant's second contention, we hold that even if there had been sufficient evidence to sustain the verdict of guilty as to the count of felony murder and the two counts of burglary, the jury's verdict convicting the defendant of felony murder and acquitting him of the underlying felony (robbery in the first degree) is repugnant. Therefore, in any event, we would reverse and dismiss the second count of the indictment (felony murder) on the ground of repugnancy.

Subdivision 3 of section 125.25 of the Penal Law defines felony murder as follows: "Acting either alone or with one or more other persons, he commits or attempts to commit robbery * * * and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants".

Basic logic mandates that where a jury acquits a defendant of robbery he cannot at the same time be found guilty of felony murder predicated upon the identical robbery. The felony murder doctrine infers from the intent to commit a robbery the intent to commit, if necessary, a murder in order to achieve the underlying criminal purpose. Under the terms of the statute, therefore, it is possible to obtain a felony murder conviction in instances where the defendant could not be convicted of common-law murder because of the lack of a specific homicidal intent. One of the elements essential to a finding of guilt of felony murder is a finding that the defendant committed or attempted to commit a predicate felony (Penal Law, § 125.25, subd 3), for without it the legal fiction of transfer of intent has no basis.

In *People v Speach* (49 AD2d 210, 213), Mr. Justice MOULE,

writing for a unanimous court, stated: "The test applied to determine whether apparently contradictory verdicts on two different counts of an indictment are merely inconsistent, and can stand, or are repugnant and cannot, was set forth by this court in *People v Bullis* (30 AD2d 470). Contradictory verdicts are merely inconsistent if the counts upon which they are returned, although related to one another by the facts of the case, have different basic elements *(Dunn v United States,* 284 US 390). However, if the two counts have the same basic elements, and a verdict of guilty is returned in one and a verdict of not guilty is returned as to the other, the verdicts are repugnant and the count upon which a conviction is returned must be dismissed *(People v Bullis, supra)."*

In finding the defendant not guilty of the crime of robbery in the first degree under the third count of the indictment, the jury must necessarily have concluded that the defendant did not rob the deceased. Therefore, that verdict was repugnant to the jury's finding of guilty on the second count of the indictment, which charged the defendant with the crime of felony murder, predicated on the causing of the death of Brownshield while in the course of robbing him. In the light of the jury's acquittal of the defendant of the crime of robbery, by no rational process could the jury convict the defendant of the crime of felony murder under the second count of the indictment absent one of the essential elements—the predicate felony of robbery.

Consequently, the jury's finding of guilt as to the second count of the indictment was not only inconsistent with, but was repugnant to, the jury's finding of not guilty on the third count and the second count must therefore, be dismissed. (See *People v McEaddy,* 30 NY2d 519; *People v Clarke,* 56 AD2d 851; *People v Speach,* 49 AD2d 210, *supra; People v Tucker,* 47 AD2d 583; *People v Belvin,* 47 AD2d 929; *People v Pierce,* 40 AD2d 581; *People v Bullis,* 30 AD2d 470; cf. *People v Murray,* 40 NY2d 327.)

HOPKINS, TITONE and HAWKINS, JJ., concur.

Judgment of the County Court, Westchester County, rendered July 14, 1977, reversed, on the law, indictment dismissed and case remitted to the County Court, Westchester County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.