THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES
VITALIS, Appellant.

Second Department, April 30, 1979

APPEARANCES OF COUNSEL

*Joshua Rosenberg* for appellant.

*Eugene Gold, District Attorney (Michael J. Halberstam* of counsel), for respondent.

### OPINION OF THE COURT

*Per Curiam.*

This is an appeal from a judgment of the Supreme Court, Kings County, rendered April 23, 1976, convicting defendant of murder, upon a jury verdict. The judgment should be reversed and the indictment dismissed.

Defendant was indicted for the crime of common-law murder arising out of the killing of 16-year-old Marie Ann Barker on July 21, 1974, while she was in her apartment at 656 46th Street, in Brooklyn.

The first trial resulted in a hung jury. At the second trial, the jury deliberated almost two days before returning a verdict of guilty as charged.

The issue on this appeal is whether the evidence, which was wholly circumstantial in nature, was sufficient to establish the defendant's guilt beyond a reasonable doubt. In considering this question, it will be necessary to review the evidence in some detail.

Up until about six months prior to July 21, 1974, the defendant lived with one Barbara Reisar in a common-law husband and wife relationship at 825A 46th Street, in Brooklyn, for a period of about six years. They separated because Barbara was upset at the way the defendant treated her three children. On two occasions prior to the murder, one of which was only a week prior thereto, the defendant cohabited with Barbara at her new apartment located at 656 46th Street. At the time he also told the deceased, one of Barbara's children, that she "was the cause of all our troubles and the cause of us breaking up." In addition, once a week the deceased would bring defendant's clothes to Barbara's apartment to be washed.

On one occasion, about a week prior to the murder, the

defendant encountered the deceased, who was with her friend, Jan Stege, in nearby Sunset Park. The defendant inquired as to where the deceased's mother (Barbara) was. The deceased replied that she did not know. To this, the defendant retorted: "Keep your s___ up, and I will end up killing you." The defendant then left.

On Saturday, July 20, 1974, at about 9:00 or 9:30 P.M., Barbara left her apartment without the deceased, who had a date that night. Barbara went to meet her date, one John Seit (Skippy), at a local Brooklyn bar. She had known Skippy for 18 years. At about 10:00 or 10:30 P.M., the deceased came into the bar to get cigarette money from her.

At about midnight, the defendant came into the bar and saw Barbara kissing Skippy. Barbara said "Hello", but the defendant turned around and walked out of the bar without saying a word. At the time, he was wearing a brown suit with a flowered shirt. Barbara then left the bar, went to her apartment, woke up her two small children, took them to Skippy's apartment, left them there alone, and returned to the bar with Skippy.

At about 1:00 A.M., Barbara received a telephone call at the bar from the defendant who asked her what she was doing with that "creep" in the bar. He further told her that she was going "back with me tonight." When she refused, the defendant remarked: "We'll see about that tonight." Immediately after the call, she went to another bar to leave a message and from there she and Skippy proceeded to the latter's apartment where they spent the night.

According to a witness, at about 1:30 A.M. the deceased returned to her apartment.

In a statement given by the defendant to the police, he related that on the evening of July 20 he had returned home from his job, changed his clothes, and gone out drinking. He went to a nearby bar and, upon entering, saw Barbara kissing another man. "[H]e turned around and he looked at her and he walked out." He stated that he just walked to think things out. He stopped in a restaurant and called the bar and asked to speak to Barbara. When he got her on the phone, he told her: "You made me feel like a m___ f___, you made me feel bad, kissing that m___ f___ and, further, you're coming home with me tonight." There was no further conversation and the defendant proceeded to another bar located on 3rd Avenue and 69th Streeet in Brooklyn. He arrived there at

about 2:00 A.M. and began talking to the bar maid, one Joan Chipman, whom he knew slightly. He conversed with her about seeing his wife with another man earlier that evening and showed her pictures of his children. In one photograph, he identified the oldest looking child (the deceased), and stated that she was a stepchild and was one of the reasons why he and his wife had not gotten back together yet. According to Miss Chipman, the defendant was not drunk and his tone of voice was normal. He made no threats with regard to the deceased. At 4:00 A.M., after the bar had closed, Miss Chipman and some others drove the defendant to a nearby taxicab stand. During this time, the defendant had been attired in a suit or sport jacket and pants.

The defendant told the police that after leaving the bar at 4:00 A.M., he took a taxicab home and stayed in his residence until about 7:00 or 8:00 A.M. He then went to a candy store on 3rd Avenue and 46th Street to get the newspaper and returned home.

At about 9:00 or 9:30 A.M. on Sunday, July 21, Lisa, Barbara's younger daughter (who was 14 years old at the time of the trial), accompanied by Skippy, went to the apartment located at 656 46th Street. While Skippy remained downstairs, Lisa went up alone, found the door open, and discovered her sister, Marie, lying in bed, dead. Lisa thereupon returned to her mother who was at Skippy's house.

Barbara then went to the apartment and found the deceased dead in the bed. Nothing in the apartment seemed to have been touched from the night before. According to Barbara, the lock on the apartment door was broken and did not require a key to open. Rather, it could be opened by sticking a card or anything into it to push it open. She had previously told this to the defendant.

A police detective testified that he saw blood on the left wall over the bed, "it was saturated with blood, as was the wall over the headboard of the bed." In addition, there were "speckles of blood, drops of blood on the floor" and "blood splattered on the walls."

Shortly after the body of the deceased was discovered, a search of the garbage cans between 6th and 9th Avenues on 46th Street was undertaken by the police. In one of the cans, located in an alleyway at 872 46th Street, a pair of dungarees was discovered. Inside the dungarees was found a polo shirt, and inside the polo shirt was a hammer. The defendant

conceded to the police that the items were his, but there was no testimony that they had been in his possession at the time of the murder. The location where the items were found was a little more than two blocks from the deceased's apartment, and about 200 feet on the opposite side of the street from the defendant's residence at 825A 46th Street.

Deputy Chief Medical Examiner Dr. Milton A. Wald, who assisted in the autopsy of the deceased, gave the cause of death as a "crushing wound of skull with fractured skull, lacerated brain." Dr. Wald was unable to establish the time of death. Moreover, he testified that no depressed wounds were noted which would fit precisely the shape of a hammer. According to Dr. Wald, although a hammer would be a suitable instrument for making such a wound, he was unable to identify the hammer "from the markings." Dr. Wald also conceded that the results of a vaginal smear, taken for the presence of semen, had been lost.

Dr. Alexander S. Wiener, one of the world's leading serologists and immunohematologists, examined the pair of dungarees, the polo shirt and the hammer. The tests for blood on the dungarees were negative. Tests on the polo shirt, which contained some reddish brown stains, about a quarter of an inch across, indicated that the stains contained human blood. However, Dr. Wiener was unable to determine the type of the blood, because the amount was too small. Tests on the hammer revealed no blood.

Alfred P. Stoholski, a forensic microscopist, examined the following articles for the Medical Examiner's office: a sample of hair from the deceased, a pair of dungarees, a pullover shirt, a claw hammer and four envelopes containing hair samples (three of which contained samples from each of Barbara's three cats). He ran microscopic and other tests on the hammer and found "macroscopically reddish brown particulate matter", which he determined was blood. However, he could not state whether it was human blood. The witness also tested two hairs taken from the dungarees, compared them with the samples taken from the deceased, and found them to be "consistent", i.e., having the possibility of the same origin. However, he admitted that it was impossible to positively establish that all the hairs had a common origin, viz., the deceased's head. Of the cat hair samples, two were found to be "not consistent" with a sample taken from the dungarees and one of the cat hair samples was found to be "consistent".

The defendant did not testify and only presented one witness on his behalf, a fellow employee, who testified that the defendant had worked on his job with a delivery service, making deliveries in New Jersey, every day of the week preceding the murder, except Monday, July 16, which was a regular day off.

■ Since the issue before us concerns itself with the sufficiency of the circumstantial evidence, we have viewed the evidence most favorably to the People (see *People v Cleague,* 22 NY2d 363, 366; see, also, *Noto v United States,* 367 US 290, 296). We have assumed that the jury credited the People's witnesses and gave the People's evidence the full weight that might be reasonably accorded it. Nevertheless, in our opinion, the evidence is legally insufficient to establish that the defendant was proven guilty beyond a reasonable doubt of the crime of murder and, consequently, the indictment must be dismissed (see CPL 470.20, subd 2).

■ ■ The People's case against the defendant consisted entirely of circumstantial evidence. Circumstantial evidence is evidence of a collateral fact, that is of a fact other than a fact in issue, from which, either alone or with other collateral facts, the fact in issue must be inferred (Richardson, Evidence [Prince, 10th ed], § 145). It is well settled that in order to sustain a conviction which is based entirely upon circumstantial evidence, the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them, and the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence *(People v Lagana,* 36 NY2d 71; *People v Benzinger,* 36 NY2d 29; *People v Williams,* 35 NY2d 783; *People v Borrero,* 26 NY2d 430).

As we view the evidence in its entirety, we repeat the caution we recently uttered in *People v Mitchell* (64 AD2d 119, 125), wherein we cited the following language from *People v Cleague* (22 NY2d 363, 367, *supra):* "The danger, therefore, with the use of circumstantial evidence is that of logical gaps—that is, subjective inferential links based on probabilities of low grade or insufficient degree—which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference."

■ The main inference in this case is drawn from a presumed fact—that the defendant was in the victim's apartment during the early morning hours of July 21, 1974—because later that morning, a pair of dungarees, a blood stained polo

shirt, and a hammer belonging to defendant, were discovered in a trash can located in an alleyway 200 feet from his apartment. The People incorrectly argue that it must be presumed the defendant was attired in the dungarees and polo shirt and that he used the hammer to kill the deceased. However, the record contains no proof that the defendant ever wore dungarees or a polo shirt that night. In fact, several of the People's witnesses testified that he had been wearing either a brown suit or jacket, and a flowered shirt. Moreover, there was no testimony that the defendant even had this clothing in his possession prior to the murder. There was testimony that once a week the deceased did the defendant's laundry at her apartment. This would explain the possible presence of hair from the deceased, as well as some of Barbara's cats, on the dungarees. There was no clear-cut proof that the clothing was not already at the apartment at the time of the murder. Similarly, there was no proof that the hammer was in the defendant's possession prior to the murder. It is noteworthy that it was brought out during the testimony that the deceased's mother could identify the defendant's hammer, but could not identify a hammer taken from her own apartment. It is quite possible that the defendant had left it there on one of his visits to the apartment prior to the murder. The expert testimony concerning the blood on the foregoing items was inconclusive and was certainly not sufficient to categorically establish the defendant's presence at the scene of the crime.

Also noteworthy is the fact that the lock on the door of the deceased's apartment was broken. Anyone could have easily gained entrance to the apartment and committed the murder, using the defendant's hammer, and splattering blood on his shirt which the deceased had brought there to be washed. We believe that from the facts before us, the foregoing hypothesis flows just as logically as does the theory of the prosecution as to how the murder occurred.

One thing which we find crucial is the failure of the Medical Examiner to establish when the deceased died. According to the testimony she was alone in her apartment from 1:30 A.M. on. The defendant could not have arrived there any earlier than sometime well after 4:00 A.M. because he was at a bar until that time. Absent proof as to time of death, it is possible that the deceased was murdered between 1:30 A.M. and 4:00 A.M. during which time the defendant was in the bar.

Placed against the foregoing, the testimony by the People's

witnesses concerning the defendant's bad feeling toward the deceased loses its value. Moreover, we find that the testimony by Jan Stege that she heard a statement allegedly made by the defendant to the deceased, "Keep your s--- up and I will end up killing you", made about a week prior to the murder, adds little value to the People's case. It was brought out that the witness did not mention the making of this statement at the first trial, and related it to the authorities for the first time only a few days before the retrial. In any event, this statement does not necessarily link the defendant to the crime. In our recent decision in *People v Mitchell* (64 AD2d 119, *supra),* the circumstantial evidence was far stronger than here. There, about a week prior to the murder, the defendant told two people that there was a person named Brownshield at the YMCA who had a stereo and some money whom he wanted to set up and "rip-off"—rob. A week later, the body of the deceased, with the shoes missing, was found in his room at the "Y" with a puncture wound in his side. The stereo set was missing from the room. In the defendant's room, also located in the "Y", was discovered a torn envelope addressed to the deceased, a pair of spotted blue jeans (the spots were later determined to be blood, but not necessarily human), a pen knife with a two and one-half-inch-long blade found in the pocket of the jeans, and a pair of shoes. We reversed the conviction for felony murder and dismissed the indictment, holding that the evidence was legally insufficient to establish that the defendant was proven guilty beyond a reasonable doubt. We noted that the evidence, as in the case at bar, was wholly circumstantial, and that there was no conclusive proof that the defendant had actually been in the deceased's room at the time of the murder. We also noted as crucial the inability of the two medical examiners to establish the time of death.

Accordingly, the judgment should be reversed, on the law, and the indictment dismissed.

SUOZZI, J. P., O'CONNOR, RABIN and SHAPIRO, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered April 23, 1976, reversed, on the law, indictment dismissed and case remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.