■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHARLES LEWIS, Appellant. — Appeal from a judgment of the County Court of Ulster County (Vogt, J.), rendered June 16, 1982, upon a verdict convicting defendant of the crime of murder in the second degree. ¶ On September 15, 1981, the badly decomposed body of 20-year-old Lynn May Bailey was found floating face down in Cooper Lake in Ulster County. Her body was encased in a black vinyl zippered bag, fully clothed, with her wrists tied to her ankles and her neck and legs bound with two sweaters. The bag, weighted down with stones, was fastened about her body with a blouse and a pair of suspenders. There was no evidence of a struggle or any traumatic injuries other than fresh needle marks in each arm near the elbow, indicating an intravenous injection. An autopsy established drowning as the cause of death, with the further opinion from the People's forensic expert that the victim had been conscious when placed in the lake. A general toxicological screening by the New York State Police laboratory was negative, except for a blood alcohol content finding of .09%. The date of death was between September 10, 1981 and September 13, 1981. ¶ The last person known to have seen Bailey alive was defendant. Although defendant did not testify at his trial, a series of taped conversations he had with police officers disclosed that he had been living with Bailey in an apartment in the Town of Woodstock for about a year, until their final breakup on the evening of September 10, 1981. Following an argument and their decision to part on this occasion, Bailey packed a few personal items in a black zippered vinyl bag and asked defendant to drive her to nearby Willow, New York. The argument increased in severity to the point where defendant put her out of the vehicle at 2:30 A.M., September 11, 1981, in a secluded, wooded area about two miles from the location where her body was ultimately discovered. He then returned to the apartment, and later in the morning, removed the remainder of Bailey's personal belongings, packed in black plastic bags, to the Saugerties dump. Defendant then surrendered the key to the apartment and received the $600 security deposit from the real estate agent from whom he and Bailey had rented the apartment. He also revealed that, previously, on September 7, 1981, he had contacted the agent and told her to remove Bailey's name from the lease. Thereafter, defendant drove to the City of Kingston on an errand for his employer, Frank Faucci, who operated a taxi service, where the car broke down. He then purchased a bus ticket to Los Angeles, California, boarded the bus and departed. ¶ On September 15, 1981, defendant called Constable Holsapple of the Town of Woodstock, inquiring if a warrant had been issued for his arrest for abandoning Faucci's vehicle in Kingston. On that occasion, he advised Holsapple that he had learned that Bailey was missing and that he had obtained that information from her parents. Since Holsapple was, at that moment, unaware of the disappearance of Bailey, he asked defendant to call him again the next day. Defendant complied, and the ensuing telephone call was recorded. The original call on September 15, 1981 was not recorded. The tape recording of the September 16 call, as well as one on September 17, were received in evidence at defendant's trial. The conversations were extensive and contained a litany of the problems which confronted defendant during his relationship with Bailey. Although he described these problems, his emotional state and the often physical contacts between them, he denied ever causing her any harm. The extensive conversation on September 17, 1981 provided the basis to trace the source of defendant's call, and he was, accordingly, arrested by the San Francisco police at a public telephone booth in that city while in conversation with police authorities in Woodstock. Charged with the murder of Bailey, defendant was indicted, tried and convicted upon the evidence accumulated by the investigative authorities, the telephone conversations with local police and taped interviews with members of the San Francisco Police Depart-

ment. ¶ Since all of the significant evidence connecting defendant with the murder is circumstantial in nature, on this appeal defendant first contends that his guilt was not proven beyond a reasonable doubt. A careful review of the evidence presented by the prosecution leads us to conclude that the jury could find that defendant's guilt was proven beyond a reasonable doubt. He was the last person known to have seen Bailey alive; their stormy relationship of a year's period was interrupted 10 times with similar separations, culminating with the final one on September 10, 1981. He was beset with serious financial and emotional problems, founded in a deep jealously of his paramour's interest in other, more affluent, men. After abandoning her in a secluded area, defendant admitted disposing of all of her personal belongings, including linens, clothing, family gifts, her car registration and driver's license. These items were recovered by the State Police with the aid of a bulldozer from the Saugerties dump. ¶ After disposing of these personal items, he then took possession of his only remaining asset, the $600 security deposit, fled the jurisdiction, changed his appearance by cutting his long hair and removing all facial growth, called the local police from Las Vegas, Nevada, leading them to believe he was in Los Angeles, inquired about a possible larceny charge, and then parenthetically informed the officer that Bailey was missing at a time when the officer had no report of such a missing person. Defendant stated that the source of this information was a telephone conversation he had with Bailey's parents, but both parents testified that no such call was ever made.[*] Later, defendant insisted he had stated that he learned of Bailey's disappearance from a friend and co-worker at the taxi company, Barry Titus, but no record of such a call was found and all other calls made by defendant relative to this matter were made as charges against his parents' home telephone in Rhode Island. In any event, the jury, as a matter of credibility, accepted the testimony of Constable Holsapple on this issue, and were obviously concerned about it since they requested that testimony be read back to them after they retired to deliberate. Thus, the People established opportunity, motive, flight from the scene and false statements made to the authorities, together with a feigned posture of co-operation which could be construed as an attempt to conceal guilt (*People v Harris,* 306 NY 345, 348-349). ¶ It is our view that defendant was enmeshed in a web of circumstantial evidence which fulfills the requirement that the facts presented are not only inconsistent with innocence, but exclude to a moral certainty every other reasonable hypothesis but guilt (*People v Montanez,* 41 NY2d 53). The jury was so charged as to the law and they were satisfied that such facts supported the finding of guilt (see *People v Benzinger,* 36 NY2d 29, 32). Viewing these facts most favorably to the People, as we must do under these circumstances (*People v Leach,* 57 AD2d 332, 337, affd 46 NY2d 821), we find the trial evidence sufficient (see *People v Gallo,* 75 AD2d 148). ¶ We also reject defendant's arguments of lack of probable cause to arrest him in the telephone booth in San Francisco and of prosecutorial misconduct in summation (see *People v McRay,* 51 NY2d 594, 602; *People v Douglas,* 36 AD2d 994, affd 30 NY2d 592). ¶ Judgment affirmed. Kane, J. P., Weiss and Levine, JJ., concur.

Main and Yesawich, Jr., JJ., dissent and vote to reverse in the following memorandum by Yesawich, Jr., J. Yesawich, Jr., J. (dissenting). The People have established that Lynn May Bailey was murdered sometime between 10:00 P.M. on September 10, 1981 and September 13, 1981, but it has not been proven to a certainty that defendant played a role in her drowning death by, as the indictment charges, "binding, gagging and restraining her and placing her

---

[*] This information was obtained by Constable Holsapple during the call of September 15, 1981, which was not recorded.

in a body of water". When they parted on September 10, 1981, for approximately the tenth time, she packed some of her belongings in a vinyl mattress bag; her response to his comment that he was taking the rest of her things to a nearby dump was indifference. Bailey requested that defendant drive her to nearby Willow, New York, and drop her near an unidentified friend's house. En route their argument escalated causing defendant to let her out before reaching her destination; this was at the intersection of Route 212 and Glasco Turnpike, some two miles from where the body was ultimately found. It was approximately 2:30 A.M. Defendant then proceeded back to their apartment and went to sleep. He never saw Bailey again. ¶ During the morning of September 11, defendant emptied the apartment of both their things, took them to the dump and since, as he and Bailey had earlier discussed, the rental was more than they could manage, he returned the key to their newly rented apartment to the realtor, who then refunded defendant's deposit. Defendant then drove to Kingston on his employer's business and when the taxi he was driving broke down, defendant decided he'd "had enough", bought a ticket and boarded a bus for Los Angeles. To this point defendant's actions, though not commendable, were neither inherently incredible nor contradicted. ¶ While the People argue that defendant told Constable Holsapple, in the unrecorded conversation of September 15, 1981, that he learned of Bailey's absence from her parents, there is convincing evidence that defendant was first made aware that he was being sought for theft of the taxi and also that Bailey was missing when he spoke to Barry Titus. This prompted defendant's call to the Woodstock police to advise them that he had not stolen the taxi, that he had told his employer's father to tell his son that the car had broken down in Kingston, and inquired about Bailey declaring he had heard that she was missing. The second call, on September 16, 1981, made at Holsapple's behest, was recorded; there defendant again voiced his concern over the warrant for his arrest for auto theft, clearing his name, and of Bailey's whereabouts. In this conversation, defendant stated that he had heard from Titus that Bailey had disappeared. At Holsapple's request, defendant called again the following evening and for over two hours, in a taped conversation, chronicled his relationship with Bailey, during which time the call was traced. The tapes, all received in evidence, reveal that although defendant on one occasion said he was in Las Vegas when in fact he was in Los Angeles, he truthfully told Holsapple when he was in San Francisco. After apprehension by the San Francisco police, defendant voluntarily furnished them a statement, also tape recorded, in which he reiterated the financial and emotional problems he and Bailey had been experiencing, denied harming her and contradicted nothing said in his two and one-half hours of conversation with Holsapple. Despite the blandishments of the police, not once in these rather extensive conversations did defendant make any admission or confession. ¶ For this conviction to stand, based as it is entirely on circumstantial evidence, the hypothesis of guilt must flow naturally from the facts proved and be consistent with them, and the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence (*People v Lagana,* 36 NY2d 71, 73-74, cert den 424 US 942; *People v Vitalis,* 67 AD2d 498, 503). We do not believe the evidence meets this standard. The prosecution suggests that because defendant was the last to see Bailey alive and was obsessed with her, and their relationship was admittedly turbulent, that defendant finally "cracked" and in a transport of emotion killed Bailey; this is hardly an indisputable inference, given the absence of any signs on Bailey's body of a struggle. Also worth noting is the lack of any proof that the clothing and suspenders used to bind Bailey belonged to her or to defendant, and the fact that there is no evidence that defendant was in possession of any hypodermic needles. ¶ The People also point to defendant's impulsive trip

to California, his short hair and clean shaven appearance upon being arrested as evidence of flight; he previously had shoulder-length and facial hair. Defendant's explanation for each is reasonable and his conduct can reasonably be viewed as that of an innocent man. In his conversations with Holsapple and the San Francisco police, he said that he left Woodstock because he needed to get away from Bailey, with whom in the past he would repeatedly resume a relationship after breaking up, a relationship which he felt was destroying his mental health. His new appearance was precipitated by his considering joining the military and was consistent with a break with the past and his now clean-cut image. Further evidence of claimed flight, such as defendant's purchase of a bus ticket on a different bus line to travel from Las Vegas to Los Angeles when his original ticket would have carried him there and his purchase of new clothing, are both susceptible of innocent explanations. It is not implausible that he may have believed that once he interrupted his passage, his ticket was no longer valid. The supposition that his actions in this respect were contrived to conceal his whereabouts is at best inconclusive, particularly when measured against the fact that he initiated three phone calls to the police, called them when requested to do so, apprised them of his location and remained on the phone long enough to enable the call to be traced. ¶ To support the theory that defendant knew Bailey was missing because he killed her and not because, as he contends, he found out from Barry Titus, the People submit that the lack of a billing charge to his parents' phone, to which he charged the calls to the police, constitutes sufficient proof. Not only is it equally possible that defendant paid for the calls to Titus, more importantly, there is other evidence that defendant heard that Bailey was missing from Titus. First, Holsapple's Grand Jury testimony stated that defendant said Titus told him about Bailey's disappearance during the first untaped conversation. There is also defendant's immediate correction of Holsapple in the first taped conversation when Holsapple proposed that Bailey's parents told him. In this regard, it is also noteworthy that the People, who bear the burden of proof, though aware of Titus, inexplicably elected not to call him to the stand. ¶ One other point requires mention; the time of Bailey's death was never established. The forensic pathologist testified that he could not determine when she died other than that it was sometime between September 10 and September 13, 1981. It is possible then that when Bailey was murdered, defendant was not even in this State (see *People v Vitalis, supra,* p 504). ¶ As the majority has recorded, some of the evidence is consistent with guilt. That defendant *may* have been responsible for Bailey's death is not, however, enough to sustain a conviction; the evidence must also be inconsistent with innocence. In our view, the evidence here is as consistent with innocence as with guilt. Accordingly, the judgment should be reversed and the indictment dismissed.