■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WESLEY A. KIRK, Appellant.—Weiss, J. Appeal from a judgment of the County Court of Broome County (Monserrate, J.), rendered September 23, 1983, upon a verdict convicting defendant of the crime of criminally negligent homicide.

On February 19, 1983, Linda Sholes requested that defendant be a babysitter for her four-month-old son, Joey. Defendant agreed to do so, and Sholes delivered Joey to his apartment at approximately 8:00 P.M. Although the child had fallen from his bed earlier in the day, he was in apparent good health at the time defendant obtained custody. Sholes returned to defendant's apartment at approximately 3:00 A.M. the next morning, at which time it was agreed that the child, who appeared to be sleeping peacefully, would stay with defendant until morning. Sholes returned at approximately 10:00 A.M., only to find that Joey appeared to be dead. Defendant briefly tried to resuscitate the child and then immediately called an ambulance. The child was taken directly to the hospital but was pronounced dead on arrival at 10:15 A.M.

Shortly after arriving at the hospital, defendant approached the responding police officer, Richard Edwards, and indicated that he was the child's baby-sitter during the night. When Edwards inquired as to what transpired, defendant first indicated that the child was restless throughout the night, that both he and Joey fell asleep with Joey lying on his chest, and that he fed the baby some formula at approximately 7:30 A.M., after which the child fell back to sleep. Defendant stated that

he did not realize the child's situation until the mother returned at 10:00 A.M. After a brief interval in the conversation with Edwards, defendant inquired as to the child's condition. When Edwards responded that the child had died, defendant "appeared visibly shaken" and recalled that Joey had fallen off the bed at approximately 4:00 A.M., striking his head on a radio on the floor. Defendant stated that he stopped the bleeding with a cold compress and that the baby went back to sleep. When asked if he would sign a deposition to that effect, defendant agreed to accompany Edwards to the police station. Once at the station and after being apprised of his *Miranda* rights, defendant initially repeated the above sequence of events to Investigator William Grace. When Grace advised defendant this his story was inconsistent with the results of an autopsy performed that morning, "[Defendant] burst out. He started crying very heavily. And he said, 'I didn't mean to hurt the child.' " Defendant then related how Joey continued to cry after falling off the bed. In an attempt to muffle the sound, defendant placed a pillow over the child's head. When this proved unsuccessful, defendant became angry and struck the child in the back of his head with his hand. Joey stopped crying shortly thereafter and defendant went to sleep. These statements were later reduced to writing.

Premised on the foregoing and an autopsy report demonstrating that Joey's death was occasioned by several severe skull fractures, defendant was charged in a one-count indictment with murder in the second degree. After a jury trial, in which the trial court submitted only the lesser included offenses of manslaughter in the second degree and criminally negligent homicide, defendant was convicted of the latter and sentenced as a second felony offender to a term of 2 to 4 years' imprisonment.

On this appeal, defendant maintains that the trial evidence, which was entirely circumstantial in nature, was insufficient to establish his guilt beyond a reasonable doubt. A careful review of the entire record leads us to conclude that the trial evidence was sufficient to support the verdict. We recognize that where, as here, the People rely exclusively on circumstantial evidence to establish the guilt of the accused, such evidence must exclude to a moral certainty every other hypothesis except that of guilt (*People v Montanez,* 41 NY2d 53, 57; *People v Lewis,* 100 AD2d 669, *affd* 64 NY2d 1111; *People v Simmons,* 99 AD2d 880; *see, People v Bell,* 94 AD2d 894, 895, *affd* 63 NY2d 796). Only where the totality of the evidence would lead a reasonable man to reject any hypothesis but

guilt is this standard met (*see, People v Benzinger,* 36 NY2d 29). Here, the People produced three pathologists who essentially agreed that death resulted from several extensive skull fractures, with subarachnoid hemorrhages and associated brain injuries; that these injuries were occasioned by multiple, severe applications of a blunt force; that the hemorrhaging appeared fresh; and that the injuries could not have been sustained during the two falls from bed described by the child's mother and defendant. More specifically, as to the timing of the injuries, Dr. Halbert Fillinger testified that the child would have lost consciousness within 15 minutes of the fractures sustained; Dr. Elliot Gross indicated an outermost period of 6 to 12 hours between the injuries and death; and Dr. Umadevi Katta opined that the child had died within one day of the autopsy, performed at 11:30 A.M. on February 20, 1983, that the hemorrhaging was fresh and at most 12 to 14 hours old, and that the child could have died immediately or within a few hours of sustaining the fractures.

Although defendant produced Dr. Bhart Patel, the emergency room physician, who opined that the injuries in question could have been sustained in a fall and that the timing of the injuries was impossible to determine, the jury obviously resolved this credibility issue in favor of the People. Similarly, although defendant produced a witness, one Susan Martinez, who described the child as "listless * * * like a rag doll" on the evening of February 19, 1983, there were numerous other witnesses who confirmed that Joey was in good health when placed in defendant's care. Given that defendant was virtually in exclusive custody of Joey from 8:00 P.M. on February 19, 1983 until 10:00 A.M. the next day when Joey was found dead in his apartment as the result of numerous severe skull fractures of recent origin, and that defendant gave three divergent versions as to what transpired during these hours until finally admitting to striking the child, we find that the evidence, when viewed in a light most favorably to the People, amply supports the verdict (*People v Lewis, supra,* p 670).

Moreover, beyond the fact that defendant failed to either request a "total circumstantial charge" or to object to the charge given (*see, People v Bernardo,* 83 AD2d 1, 3), our review of the trial court's instructions confirms their propriety (CPL 300.10 [2]; *People v Gonzalez,* 54 NY2d 729; *People v Benzinger, supra,* p 32; *People v Morris,* 36 NY2d 877, 878-879). The trial court astutely apprised the jury that defendant's statements constituted circumstantial rather than direct evidence (*see, People v Sanchez,* 61 NY2d 1022, 1023; *People v*

*Burke,* 96 AD2d 971, 972, *affd* 62 NY2d 860) and proceeded to give a complete explanation of the legal principles attendant circumstantial evidence cases. That the court utilized "reasonable doubt" terminology in addition to the "moral certainty" phrase did not serve to diminish the accuracy of the charge (*see, People v Gonzalez, supra,* pp 730-735 [Fuchsberg, J., concurring]; *People v Bell, supra,* p 895).

Judgment affirmed. Mahoney, P. J., Kane, Casey, Weiss and Levine, JJ., concur.