601 A.2d 175

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
BRAYNARD PURNELL, DEFENDANT–APPELLANT.

Argued May 7, 1991—Decided January 15, 1992.

*Bernadette DeCastro,* Assistant Deputy Public Defender, and *James K. Smith, Jr.,* Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney; *Bernadette DeCastro, James K. Smith,* and *Claudia Van Wyk,* Deputy Public Defender II, on the briefs).

*Sandra M. Iammatteo,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

The central question in this capital appeal is whether a jury may impose a sentence of death on the basis that the murder was committed in the course of a felony without being permitted to consider, in the guilt-innocence phase of the capital trial, the non-capital verdict of felony murder. We find such a procedure to be constitutionally defective. The right to trial by jury includes the right to have the jury consider "all of the possible offenses that might reasonably be found" from the facts of a case. *State v. Ramseur*, 106 *N.J.* 123, 271 n. 62, 524 *A*.2d 188 (1987). The State is not free to select which verdict it will permit a capital jury to return. By seeking a sentence of death predicated on an underlying felony committed in concert with the murder, the State necessarily affirms that there is a rational basis in the evidence for the jury to have considered the non-capital verdict of felony murder. Here, however, the State did not submit felony murder to the jury. Because the jury was not permitted to consider "all of the possible offenses," defendant was denied the right to a fair trial on the issue of his death-eligibility. The sentence of death must be vacated. The convictions of murder and related offenses entered in the guilt-phase of the trial are otherwise affirmed.

I

A.

In a long series of cases, we have explained that a jury must decide the death-eligibility of capital defendants. The fact-finding role of a jury is especially crucial when, as in this case, the State and the defendant disagree on almost every fact alleged. The State asserts that defendant killed the victim, Lawrence Talley, during the course of a drug transaction and that defendant then stole drugs from the body of the victim. In that regard, the case evokes the pattern that we saw in *State v. Perry*, 124 *N.J.* 128, 590 *A*.2d 624 (1991), in which the defendant killed his drug supplier. The case differs markedly

from *Perry*, though, in that defendant denies any involvement at all in the killing of the victim. Recall that in *Perry* the defendant admitted that he had grabbed the victim "by the neck" and that "the pressure of my grip strangled him." *Id.* at 140, 590 *A*.2d 624.

Although the State sought to impose a capital sentence on the basis of a murder committed in the course of a robbery, it did not indict defendant for the robbery. Nevertheless, at the guilt phase the State offered evidence that on the night of the murder defendant had possessed an amount of cocaine packaged in ziploc bags, known to be used by the victim in his drug trade. Having denied any involvement whatsoever in the killing of Lawrence Talley, defendant was not in a position to argue to the jury that an uncharged robbery provided the basis for a felony-murder verdict. Nevertheless, the court had a nondelegable responsibility to insure a fair trial.

## B.

The evidence clearly implicated defendant in the killing of Lawrence Talley in West Atco, New Jersey, on Friday, August 26, 1988. For purposes of review, we shall largely incorporate defendant's version of the facts. It was the State's theory that defendant had stabbed Talley during the course of an attempted drug transaction and had hidden the body in a hedgerow in defendant's backyard, where it was found two days later. Because no one ever saw defendant stab Talley and because there was no physical evidence connecting defendant with the crime, the State's case was entirely circumstantial.

*The drug transaction.*

A prosecution witness, Marie Simmons, testified that defendant would come to her house "two to three to four times out [of] the week" to "get high" on cocaine and that he usually brought with him a "twenty," meaning an amount of cocaine valued at $20. She testified that on Friday, August 26, at approximately 6:00 p.m., defendant had come to her home and

had wanted "a sixteenth," meaning approximately one and one-half grams of cocaine. On defendant's request she went to a neighborhood playground where she met with Talley to negotiate a drug transaction with him. They disagreed over the purchase price, but Talley said that he would stop by her house later. Instead, Talley sent a confederate, Jeffrey Davis, to sell a $20 bag of cocaine to defendant and Simmons. Defendant refused that deal because, as Davis testified, defendant "wanted a bigger quantity." After Davis left the apartment defendant went to the playground himself to meet with Talley. Witnesses at the playground testified that defendant, Talley, and Davis left the playground together. According to Davis, although he had initially walked with defendant and Talley, he did not accompany them to defendant's house, due to defendant's objections to his presence.

*The fight in defendant's backyard.*

The scene now shifts to defendant's home on Pine Avenue. Shortly before 9:00 p.m., defendant's daughter, Dia, heard "a lot of noise, a lot of hollering" in their backyard. Dia ran outside accompanied by her two brothers, Dennis and Lord Tee. (Defendant is the natural father only of Dia and not of her brothers. Gretchen Shaw is the natural mother of all three children and is defendant's fiancee.) Dennis carried a machete outside with him. Once outside, Dia heard "[s]omebody running through the woods" and a person yelling, "don't leave me Jeff." As she approached the backyard, Dia saw her father grappling with another man. Eventually, the two men fell to the ground, with her father on top. Dia saw her father hit the man approximately two times. Dennis and Lord Tee saw defendant chase two men into the woods. Dennis heard "scuffling in the woods" and someone saying, "Jeff, he's trying to kill me." Both Dia and Dennis testified that the man with whom defendant was fighting was not Lawrence Talley.

As soon as they saw what was happening, Dia and Lord Tee ran to a neighbor's house to call the police. In her transcribed

call to the police, Dia stated that "[s]omebody is trying to break in my house and now two guys are jumping my dad."

The neighbor ran to defendant's house, saw Dennis, and asked him, "where was they fighting at?" Dennis gave him the machete, and then the neighbor went "halfway back" to the rear of the house. He saw "back there on his knees" a man who told him that he was alright but that "they got away." As the man began to stand, the neighbor recognized him as defendant. He did not notice any bruises or marks on defendant.

Dennis then returned to the neighbor's house and told his sister that they did not need the police "because it was over." The police were called and told not to go to defendant's house. Nonetheless, the police arrived, spoke briefly with Dia, and performed a cursory search of the backyard. Soon afterward, Jeffrey Davis went to defendant's house and spoke with Dennis, asking for Talley. When told that Talley was not there, Davis went to Marie Simmons's house. After Davis explained to her what had happened, Simmons called the Winslow Township Police Department and local hospitals trying, without success, to locate Talley.

At trial, defendant attempted to prove that two people, Arthur Ellison and Gary Bey, had seen the victim alive late on the evening of August 26. Ellison testified that he had seen the victim speaking with Bey at the Maple Lake Inn, but indicated that he had seen them soon after dusk and not late that night. Bey did not testify.

*The remaining events of the evening.*

That night, Theresa Daniels, a co-worker of Gretchen Shaw, drove Gretchen home from work. Daniels testified that at about 10:00 p.m., after they had entered the house, "Lawrence, [defendant], and Gretchen started talking" in the kitchen and then went into the bedroom. (Neither the defense counsel nor the prosecutor questioned Daniels on her reference to the victim. Thus, we assume that "Lawrence" is an error in the transcript or refers to someone other than Talley.) Gretchen

testified that defendant had told her he was "okay" but that he "almost had one." She did not notice any marks or scratches on defendant. As Daniels was getting ready to leave, defendant asked her if she could drop him off at the Maple Lake Inn.

Once at the Inn, Daniels decided to stay for a few minutes. Defendant borrowed her car. Marie Simmons testified that defendant had arrived at her house sometime between 10:00 and 10:30 that evening, driving "a little brown car, hatchback," presumably Daniels' tan 1981 Toyota Corolla. Simmons described defendant as having a cut on his right arm that "was oozing with blood." Another person who was at Simmons's house noticed that defendant had "a bruise right underneath his eye." According to Simmons, defendant gave her "a sixteenth" of cocaine that he had obtained in Camden. She described the cocaine as being in a "clear ziploc bag," the same sort used by Lawrence Talley. Defendant then allegedly injected himself with some of the cocaine while Simmons smoked some of it. Other people came in and out of the house. Defendant left, but later returned and gave Simmons "another sixteenth and a couple of twenties." Simmons testified that defendant had stayed at her house until 3:30 a.m., although members of his family claim that he was home much earlier than that.

*The discovery of the body.*

On Sunday, August 28, Talley's sister, Charlotte, spoke with Jeffrey Davis and learned that her brother had not been seen for two days. She and Davis went to defendant's house to inquire about her brother. After looking around the outside of the house, they spoke with defendant. Defendant told them that "two guys came and jumped out the car and went chasing [the victim] * * * through the woods." Feeling uneasy about defendant's story and noting a "big black and blue mark" on his face and "all these scratches on his arms," Charlotte decided to go to the neighbor's house to check out the story. After speaking with the neighbors, Charlotte and Davis returned to

search further defendant's property. Soon after they arrived at the Purnell house, Davis noticed a foot sticking out of a hedgerow. It was Talley's body.

A medical examination disclosed that Talley had been killed by fifteen stab wounds to the neck, chest, and abdomen. There were scratches on the victim's back, which, according to the medical examiner, were consistent with the body having been dragged. Although, according to Davis, on the night of the murder Talley had been carrying "a sixteenth or more" of cocaine, no drugs were found on the victim and, except for a quarter lying underneath the body, no cash was found.

*The investigation.*

The Winslow Township Police went to the Purnell house and spoke with defendant. Defendant first told them that he had not seen Talley since 6:30 on Friday evening. He said that Talley had come to his house then, but he had been "busy" and had told Talley to come back later. He said that at 8:30 p.m. he had seen two men fighting in the backyard and that when he hollered "call the police," they had run off. He did not indicate that he had been in a fight with the two men. The police saw scratches on defendant's arms and a puncture wound on his upper arm. They discovered a long, shallow hole approximately twelve feet from the body. Conflicting information was presented about whether the potential grave site was intended for the victim or for a dog that had been buried elsewhere on the property.

Defendant's daughter, Dia, gave the police a taped statement in which she did not implicate her father in a fight with the men in the backyard. On September 1, the police obtained a tape of the call made by Dia to the police on the night of the murder in which she had said, "two guys are jumping my dad." Later that day, Dia gave another taped statement to the police and admitted for the first time that her father had been one of the men involved in the fighting. On that same day, the police arrested defendant. After the police advised him of his rights

and of some aspects of a self-defense claim, defendant admitted that he had been involved in a fight in his backyard with one of the two unknown men.

Defendant voluntarily appeared before the Camden County grand jury. He told the jurors that he had not seen Talley at all on the night of August 26, that he had not gone to Marie Simmons's house, and that he had not used drugs. He said that he had been confused when he told the police that Talley had been at his house that evening. He related the incident with the two men in his backyard. He emphasized that initially he had not told the police that he had been involved in the fight because "there's a body involved in this" and he was afraid that he might be incriminated.

Examinations of physical evidence, including hair, blood, and fiber samples, failed to establish any clear connection between defendant and the crime. Nor did the investigation corroborate the allegation that defendant had used drugs at Marie Simmons's home.

*The trial.*

The Camden County grand jury indicted defendant on five counts: knowing and/or purposeful murder, hindering his own apprehension by concealing the victim's body, hindering his own apprehension by intimidating a witness into giving a false report, possession of a weapon with an unlawful purpose, and perjury. A jury convicted defendant on all charges, except the hindering charge concerning concealment, which had been dismissed at trial. In the sentencing phase, the State asserted two aggravating factors: that defendant had been convicted of a prior murder, *N.J.S.A.* 2C:11–3c(4)(a), and that the murder had been committed during the course of a robbery from Talley. *N.J.S.A.* 2C:11–3c(4)(g). Defense witnesses set forth redeeming aspects of defendant's character and personality, the good works that he had done for other people, and the fact that he had not been using drugs.

Although three jurors found the existence of mitigating factor 2C:11–3c(5)(b), that the victim had participated in the conduct that resulted in his death, and two jurors found the catch-all mitigating factor, 2C:11–3c(5)(h), the jury unanimously found the existence of the two aggravating factors and that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Consequently, defendant was sentenced to death on the murder count. After merger of the weapons charge, the court imposed sentences on the non-capital counts. Defendant appeals to us as of right under *Rule* 2:2–1(a).

## II

In *Schad v. Arizona,* —— *U.S.* ——, 111 *S.Ct.* 2491, 115 *L.Ed.*2d 555 (1991), the Supreme Court held that it was not harmful error that Arizona did not require a jury to distinguish between premeditated murder and felony murder in returning a conviction of capital murder that was death-eligible. The plurality in that decision reasoned that the dissent's focus on the "risks of different punishment" for premeditated and felony murder ignored the fact that the Arizona sentencing statute applicable to the defendant authorized the same maximum penalty, death, for both means of committing first-degree murder. —— *U.S.* at —— n. 9, 111 *S.Ct.* at 2504 n. 9, 115 *L.Ed.*2d at 573–74 n. 9. Although no opinion in *Schad* commanded five votes on the issue of separately submitting the felony-murder verdict to the jury, its corollary would appear to be that under a capital-sentencing scheme like New Jersey's that does not make felony murder death-eligible, to sentence a defendant to death based on an underlying felony without allowing the jury to consider the non-capital verdict of felony murder would be constitutionally impermissible.

We have consistently held that all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury. To truncate the definitions of the murder statute and thus deny a

jury the mechanism to decide which of the forms of murder has been proven is unacceptable. *State v. Long*, 119 *N.J.* 439, 462, 575 *A.*2d 435 (1990). In that respect, defendant's claim of entitlement to a felony-murder charge is similar to a request for a lesser-included offense charge. We have regularly held that a defendant is entitled to such a charge if there is any evidence "that would have afforded the jury a rational basis for convicting" the defendant of the lesser-included offense. *State v. Moore*, 113 *N.J.* 239, 290, 550 *A.*2d 117 (1988). In *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188, we held that a trial court must charge the jury regarding "all of the possible offenses that might reasonably be found from such facts." *Id.* at 271 n. 62, 550 *A.*2d 117. Although strictly speaking felony murder is not a lesser-included offense of murder in the sense that its elements are different, the statutory definition of lesser-included offenses, as we noted in *State v. Sloane*, 111 *N.J.* 293, 300, 544 *A.*2d 826 (1988), is not "all-encompassing," nor are the statutory categories "water-tight compartments." As Justice Stein has noted, *Sloane* suggests that in certain circumstances, subject to the requirements of fair notice, an offense, if supported by the evidence, should be charged to the jury even though it does not meet the Code's definition of lesser-included offense. *State v. Mancine*, 124 *N.J.* 232, 265, 590 *A.*2d 1107 (1991) (Stein, J., concurring). That principle "comports with our general view that subject to fair notice the jury should resolve the degree of an actor's guilt on the basis of the evidence presented to the jury." *Sloane, supra,* 111 *N.J.* at 300, 544 *A.*2d 826.

We have held that at the very core of the guarantee of a fair trial in a criminal case is the judicial obligation to insure that the jury's impartial deliberations are based solely on the evidence and are made in accordance with proper and adequate instructions. *State v. Simon*, 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979). Indeed, "so paramount is the duty to insure a fair trial that a jury must deliberate in accordance with correct instructions even when such instructions are not requested by coun-

sel." *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1990); *see State v. Moore, supra,* 113 *N.J.* at 288, 550 *A.*2d 117 (trial court's failure to charge on diminished capacity constitutes reversible error although charge was never requested by defense counsel). Obviously, there may be circumstances in which a defendant will specifically request that a jury not be charged on a lesser-included offense as a matter of trial strategy. Whether such a request can or should be acceded to, especially in a capital case, raises concerns regarding the interests of the public (represented by the jury) in being presented with "all of the facts and all of the possible offenses that may reasonably be found from such facts." *State v. Choice,* 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985). We need not debate that issue in this case, for there is nothing in the record to indicate that a specific request not to charge felony-murder was made here.

New Jersey defendants cannot be subjected to the death penalty for murder if their intent is found to be anything less than knowingly or purposefully to cause death. *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). If, within the body of evidence presented at trial, proofs exist that provide a rational basis for a jury verdict of a lesser-included offense, a defendant is constitutionally entitled to have that alternative offered for jury deliberation. *State v. Coyle,* 119 *N.J.* 194, 222–23, 574 *A.*2d 951 (1990); *see also State v. Crisantos,* 102 *N.J.* 265, 276, 508 *A.*2d 167 (1986) (trial court should charge on a lesser-included offense if there is rational basis in the evidence to support conviction of that offense). By relying on the robbery as an aggravating factor, the State necessarily affirmed that proofs existed that provided a rational basis for the jury to choose the death-ineligible option of finding defendant guilty of felony murder. To deprive a capital defendant of a lesser-included alternative murder charge, which arguably would have affected the deliberation of a death sentence, is not constitutionally permissible.

The cases cited by the State in its supplemental brief do not stand for the proposition that a New Jersey defendant may be sentenced to death on the basis of an unindicted felony that was not found as part of its guilt verdict without submitting the non-capital felony-murder issue to the jury. Since, as we have seen in *Schad v. Arizona, supra,* — *U.S.* ——, 111 S.Ct. 2491, 115 *L.Ed.*2d 555, in some jurisdictions felony murder is a death-eligible alternative form of first-degree murder, there is no reason to submit to the jury a separate verdict on felony murder. In that statutory context (when both forms of murder, intentional murder and felony murder, are death-eligible), the aggravating factor serves as an independent sentencing guide for consideration by the sentencing jury just as, for example, the prior murder factor would. That type of factor need not be established in the guilt phase of a trial.

Obviously, our Legislature did not intend, nor does constitutional principle require, that every aggravating factor under *N.J.S.A.* 2C:11–3c that renders a murder death-eligible be the subject of an indictment and a guilt-phase verdict. For example, although factors c(4)(f), killing to escape detection, and factor c(4)(h), killing a police officer, can constitute separate criminal offenses, neither principles of constitutional law nor of fundamental fairness require that the factors be tried as separate indictable offenses in the guilt phase. If proper notice were given, the sentencing-phase jury could make its unanimous finding of such a factor without a prior guilty verdict and without unfairness in the trial.

While it is true, as our concurring member notes, *post* at 556, 601 *A.*2d at 194 that if notice of an aggravating factor has not been given to a defendant before trial, that factor may not provide the basis for a death sentence in that same trial, it is also true that death-eligibility functions not as a freeze-frame or snapshot but rather as a moving picture. Once established, that aggravating factor might form the basis of a death sentence in a later proceeding if proper notice were given. *State v. Biegenwald,* 110 *N.J.* 521, 542 *A.*2d 442 (1988) (*Biegenwald* III).

■ But when the separate offense encompassed by the aggravating factor is, in itself, a basis for an alternative form of murder that is non-capital, a defendant is constitutionally entitled to have that alternative offered for jury deliberation in the guilt phase. Because defendant was denied the right to have the jury decide "all of the possible offenses [capital and non-capital] that might reasonably be found" in the evidence, *State v. Ramseur, supra,* 106 *N.J.* at 271 n. 62, 524 *A.*2d 188, we vacate the sentence of death.

## III

Because our decision on the felony-murder issue renders moot many of the other issues raised in defendant's appeal, we shall not address them in detail, except to the extent that they may recur in any further proceedings or affect the validity of the verdicts that remain.

A. Was defendant tried by a fair and impartial jury?

■ Defendant raises various challenges to the selection of his jury. He asserts that the trial court applied an incorrect standard in the death-qualification of the jurors. Those issues have been mooted by our disposition and have been discussed extensively by this Court. *See State v. Biegenwald,* 126 *N.J.* 1, 594 *A.*2d 172 (1991) (*Biegenwald* IV); *State v. Dixon,* 125 *N.J.* 223, 593 *A.*2d 266 (1991); *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (*Williams* II). No further discussion is required. We are satisfied as well that the use of an unsworn jury questionnaire as a preliminary basis for selecting jurors does not violate our jury-selection procedures. *See State v. Moore,* 122 *N.J.* 420, 454, 585 *A.*2d 864 (1991) (discussing use of questionnaire). Each of the jurors was sworn and examined under oath in respect of the answers set forth in the questionnaire. A trial court should take care to assure that in an individual *voir dire,* a juror affirms that his or her statements on the questionnaire are true. Finally, defendant argues that

the trial court's failure to question potential jurors concerning possible racial prejudice against defendant constituted plain error. Yet, no one has suggested that this crime was of an "interracial nature," *State v. McDougald,* 120 *N.J.* 523, 554, 577 *A.*2d 419 (1990), and nothing in the record indicates that racial issues were "'inextricably bound up with the conduct of the trial.'" *State v. Ramseur, supra,* 106 *N.J.* at 246, 524 *A.*2d 188 (quoting *Ristaino v. Ross,* 424 *U.S.* 589, 597, 96 *S.Ct.* 1017, 1021, 47 *L.Ed.*2d 258, 264 (1976)). Under those circumstances, we find that the *voir dire* on racial bias was adequate.

B.  Was defendant denied the effective assistance of counsel because his trial attorney had previously represented a State's witness?

The stated issue was raised before trial. The law firm of defendant's trial counsel had previously represented James Berry, who was a State's witness in this case, on a drug offense. Defendant argues that because the firm's interests would prohibit his lawyer from sharply cross-examining the firm's former client, the trial counsel's interest would be materially adverse to those of defendant. Before the trial began, the prosecutor informed the court of the potential conflict. Defendant was subsequently brought into the courtroom. He then stated that he was aware of his attorney's firm's prior representation of Berry, and he consented to the attorney's continued representation.

Defendant's argument is highly speculative. Nothing in the record suggests that defense counsel was prevented from serving as a "vigorous partisan" of defendant's interests. *See State v. Bellucci,* 81 *N.J.* 531, 541, 410 *A.*2d 666 (1980). Berry's case was wholly unrelated to defendant's case. There is no indication that defense counsel was forced to choose between betraying Berry's confidences or compromising his duty to defendant by not cross-examining Berry fully and uninhibitedly. Defense counsel was not prevented from cross-examining Berry fully and he appears to have conducted his cross-examination

ably. Moreover, defendant consented in open court to counsel's continued representation. Defendant now claims that his consent was thrust on him at the last moment and was neither knowing nor voluntary. However, defendant's consent appears on the record, and there is no suggestion that he was coerced or deceived into consenting.

C. Was defendant denied the effective assistance of counsel by his attorney's failure to issue a subpoena to a key witness concerning the victim's whereabouts or to request a continuance when the witness failed to appear for trial?

In a recent series of capital cases, we have set forth the standards for determining whether a capital defendant has received the effective assistance of counsel at both phases of a trial. *See State v. Oglesby,* 122 *N.J.* 522, 538–39, 585 *A.*2d 916 (1991) (Handler, J., concurring). "Capital defendants are guaranteed competent capital counsel." *State v. Davis,* 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989). In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that the attorney's performance was "so deficient as to create a reasonable probability that [that] deficiency materially contributed to defendant's conviction * * *." *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). Matters of strategy or trial tactics are almost always unassailable when they are based on a proper understanding of the law and evaluation of all the facts in a case. *State v. Marshall,* 123 *N.J.* 1, 165, 586 *A.*2d 85 (1991).

In this case, one of the critical issues was when the murder occurred. Defendant asserts that a potential witness, Gary Bey, would have placed the victim at the Maple Lake Inn, alive, sometime after 11:00 p.m. on August 26, 1988. Defense counsel presented one witness, Arthur Ellison, who testified that he had seen the victim talking with Bey at the Maple Lake Inn some time that evening, but he did not specify the time. It was obviously critical whether Talley had been killed shortly before

9:00 p.m. on August 26 in a fight in defendant's backyard or whether he, in fact, had still been alive later that evening and, therefore, was killed by someone else. In his opening statement, defense counsel said that he intended to produce two witnesses who would place the victim alive at the Inn at midnight. Following Ellison's testimony, which was far from definitive, defense counsel asked the court for a few minutes to find out whether Bey was available. Bey had assured him that he would appear, but he did not. Later that day, defense counsel put on the record that "we did wait for Gary Bey until 11:30," and then rested his case.

The question is whether to fail to request a continuance at that time in order to subpoena the witness or to fail to have previously issued a warrant for the production of the witness was ineffective assistance of counsel. Defendant argues that counsel's failure to subpoena Gary Bey or to seek a continuance to serve a subpoena was not "reasonable considering all the circumstances." *Strickland v. Washington,* 466 *U.S.* 668, 688, 104 *S.Ct.* 2052, 2065, 80 *L.Ed.*2d 674, 694 (1984). We are unable, however, to evaluate fully the claim because we are unable to ascertain what effect the production of the witness would have had on this case. Defendant suggests that Bey would have corroborated his theory, but of course that is not known. The record is insufficient to determine whether any prejudice ensued from the foregoing circumstance. *See State v. Dixon, supra,* 125 *N.J.* at 259–62, 593 *A.*2d 266 (discussion of hearing requirement in claims of ineffective assistance of counsel).

D. Did the prosecutor's comments deprive defendant of his right to a fair trial?

Defendant contends that comments made by the prosecutor during the proceedings violated his right to a fair trial. Specifically, defendant asserts that the prosecutor acted improperly when he "criticized and disparaged" defense counsel by implying that defense counsel had joined with defendant and his

witnesses and fabricated a story, he described defendant as being "despicable" for involving his children in the case, he told the jury that in order to acquit defendant it must believe that all of the State's witnesses had lied, and he referred to defendant's failure to take the stand.

We have had to reverse capital sentences when the State has exceeded the bounds of fairness in prosecuting capital cases. See, *e.g.*, *State v. Rose*, 112 *N.J.* 454, 508–24, 548 *A.*2d 1058 (1988). Obviously, a prosecutor may make a "vigorous and forceful presentation of the State's case." *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). In each of the instances of alleged misconduct attributed to this prosecutor, his comments were reasonably related to the scope of the evidence before the jury.

Over time, the defense witnesses made significant changes in their versions of the events. The prosecutor was free to comment that witnesses had "chang[ed] their versions 180, 360 degrees, whatever, about significant events that happened in this case," and it was not unreasonable for the prosecutor to suggest that the numerous conflicting and contradictory accounts given by the family members were motivated by an attempt to assist defendant. That could have been achieved, however, without the prosecutor vouching his personal opinion on the truth or falsity of any testimony of defendant or his witnesses. *See Rose, supra,* 112 *N.J.* at 518–19, 548 *A.*2d 1058. Defendant argues that the prosecutor was accusing trial counsel of being a principal in the plot to deceive the jury when the prosecutor said in his closing argument, "defense was obviously hurt by Dia's prior testimony and prior statements and they have to come up with some way to try to explain that away. * * * But now they come up with this story, well, you know, I was mad. I was mad at Braynard." Even if that statement could be read to refer to defense counsel, it is much too oblique to support defendant's claim that the prosecutor "improperly criticized and disparaged defense counsel." In

contrast, the prosecutor in *Rose* explicitly said that defense witnesses "were explained the law by the lawyers, as to what he's being charged with, what he faced and how he could beat the penalty that the law provides for him." 112 *N.J.* at 518, 548 *A.*2d 1058.

▮ By referring to defendant as "despicable" for involving his children in the matter, the prosecutor made at least a tangential suggestion that defendant had involved his children in his attempt to disassociate himself from the crime. The State argues that the use of the word "despicable" is understandable when viewed in the context of this case, that the word was used only once, and that the rest of the prosecutor's summation was devoted to a fair review of the evidence. We agree. Immediately after the reference, the prosecutor added: "[a]nd let me explain that," proceeding to detail the evidence that suggests an improper influence on the children. Given the fact-specific context, the prosecutor's remark was less inflammatory than the remark made in *State v. Marshall, supra,* 123 *N.J.* at 159, 586 *A.*2d 85, which the Court found was not reversible error.

▮ With respect to the comment that the jury would have to find all of the State's witnesses to be liars, we agree with the State that that comment was made in response to defense counsel's repeated attacks on the veracity of the State's witnesses, particularly Marie Simmons and Jeffrey Davis. Thus, in the context of this case, the comment did not constitute misconduct.

▮ Finally, defendant points to three instances in which he contends that the prosecutor improperly remarked on his failure to testify. In one comment the prosecutor referred to defendant's failure to explain how his sweatshirt was found at Marie Simmons's house, and in the other two comments the prosecutor referred to the various statements of defendant and his family. The comment on the sweatshirt was not a direct comment on defendant's failure to testify, but was at least

partially in response to defense counsel's assertion during summation that Simmons had lied when she testified that defendant had come to her house Friday night. The two other comments were appropriate in the circumstances of this case. In short, there is no indication that the prosecutor sought to take advantage of defendant's failure to testify in this case.

■ Prosecuting attorneys are afforded considerable leeway, within limits, in making their summations. *Williams* II, *supra,* 113 *N.J.* at 447, 550 *A.*2d 1172. "The determination of whether prosecutorial misconduct denied defendant the right to a fair trial must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties." *State v. Marshall, supra,* 123 *N.J.* at 153, 586 *A.*2d 85. The remarks complained of came during the prosecutor's summation, and defense counsel did not object to them. Although some of the remarks may have approached the limits of permissible advocacy on the part of a prosecutor, none of the remarks was "so egregious that it deprived defendant of a fair trial." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188.

E. Was it error not to have charged passion/provocation manslaughter?

■ Although the trial court charged the jury with the lesser-included offenses of aggravated manslaughter and reckless manslaughter, the court did not provide a charge on passion/provocation. Defendant argues that the record tells the story of a "drug deal gone sour," and that "[e]vidence of a fight was all over this record." If the record warrants a passion/provocation manslaughter charge, the defendant is entitled to such an instruction, whether or not manslaughter is consistent with the theory of the defense. *State v. Powell,* 84 *N.J.* 305, 317, 419 *A.*2d 406 (1980). However, we have not required the trial court to meticulously sift through the entire record in every murder trial to determine if some combination of facts and circumstances might rationally sustain a man-

slaughter charge. The duty of the trial court to provide that charge arises only when the facts " 'clearly indicate' " the appropriateness of that charge. *State v. Choice, supra,* 98 *N.J.* at 299, 486 *A.*2d 833 (quoting *State v. Powell, supra,* 84 *N.J.* at 318, 419 *A.*2d 406).

Despite the lengthy list of evidence that defendant contends supports a passion/provocation charge, the record provides only a few fragments of evidence that might suggest that the victim started the fight or engaged in mutual combat: (1) Dia Shaw's statement to the police dispatcher that "two guys are jumping my dad"; (2) defendant's request while in police custody to be provided with an explanation of self-defense; and (3) testimony concerning defendant's scratches and bruises. However, there are reasons to view that evidence skeptically. Dia's subsequent statements spoke of only two men fighting in the yard, one of whom she acknowledged to be defendant, and in two of those statements, including the one given during her trial testimony, she said that she saw defendant throw the other man to the ground and fall on top of him. Defendant's request to be provided with an explanation of self-defense was self-serving. Several scratches and bruises when compared to fifteen stab wounds do not suggest mutual combat.

This case is far from *State v. Mauricio,* 117 *N.J.* 402, 568 *A.*2d 879 (1990), in which we held that the failure to charge passion/provocation at the request of the defendant constituted reversible error. The record in *Mauricio* contained evidence that shortly before killing his victim, the defendant had been unfairly subjected to "two violent physical confrontations." *Id.* at 414, 568 *A.*2d 879. This case is also far from *State v. Powell, supra,* 84 *N.J.* 305, 419 *A.*2d 406. In *Powell,* we held that the trial court should have charged passion/provocation because from the evidence "the jury could easily have concluded that a lovers' quarrel occurred in which Powell was provoked by [his victim's] attempt on his life, which attempt deprived him of his senses, and caused him to kill her in a fit of rage." *Id.* at 323, 419 *A.*2d 406.

This case is closer to those cases in which we held that the defendant was not entitled to a passion/provocation charge. Even in *State v. Perry, supra,* 124 *N.J.* 128, 590 *A.*2d 624, where there was evidence that the victim, angered in a dispute over drug money, spoke harshly to the defendant, walked toward him, and pointed at him while the defendant was trying to inject himself with drugs, we held that that evidence "provided no basis for a passion/provocation manslaughter charge." *Id.* at 160, 590 *A.*2d 624. Further evidence showed that once the fighting started, the victim "broke on" the defendant, so that the defendant believed the choice "was either me or him." *Id.* at 141, 590 *A.*2d 624. In *State v. Oglesby, supra,* 122 *N.J.* at 536, 585 *A.*2d 916, in which there was controverted evidence that the victim had struck the defendant before he killed her, this Court held that the trial court did not err in not charging passion/provocation manslaughter.

As in *Perry* and *Oglesby,* the record here did not clearly indicate the need for a passion/provocation charge. Even viewed in the light most positive to defendant, that evidence does not clearly indicate the appropriateness of a passion/provocation charge.

   F.   Does failure to charge felony murder constitute grounds for reversal of the murder conviction?

In *Beck v. Alabama,* 447 *U.S.* 625, 100 *S.Ct.* 2382, 65 *L.Ed.*2d 392 (1980), the Supreme Court recognized that charging a jury on lesser-included offenses can be beneficial to the defendant because "it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." *Id.* at 633, 100 *S.Ct.* at 2387, 65 *L.Ed.*2d at 400. Defendant argues that because the court charged the jury only on the lesser-homicide offenses of aggravated murder and reckless manslaughter, charges defendant now asserts were "virtually irrelevant to the present case since there was absolutely no evidence that Lawrence Talley had been killed recklessly," the jury was faced with acquitting defendant of all

charges or convicting him of capital murder. As the State notes, that is a somewhat exaggerated view because defendant was also charged on serious-bodily-injury murder, a non-capital offense, as provided by *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792. In addition, defense counsel had objected to the State's reference, in its opening statement, to drugs and money missing from Talley's body on the basis that the indictment had not charged theft.

To be reversible error, the failure to charge must have been capable of bringing about an unjust result. *R.* 2:10–2. Defendant asserts that a felony-murder charge would have given the jury the option of convicting defendant of a non-capital murder. Because we have vacated the death sentence on that basis, there is, in the present posture of the case, no other prejudicial effect prior to a capital retrial. *See State v. Dixon, supra,* 125 *N.J.* at 256, 593 *A.*2d 266 ("Because the sentence for felony murder is the same as the sentence for knowing or purposeful murder where the death penalty is not imposed, there is no prejudice to defendant in the circumstances of this case"). If the State seeks a sentence of death, the conviction of murder must be vacated and the murder count retried. *See State v. Long,* 119 *N.J.* 439, 504–05, 575 *A.*2d 435 (1990) (discussion concerning effect of partial criminal reversal and whether reversal of capital-murder count requires reversal of any other related count prior to retrial).

G. Did the charge to the jury impermissibly dilute the State's burden to prove defendant's guilt on all counts beyond a reasonable doubt?

Defendant contends that the trial court's charge regarding the prosecution's obligation to establish guilt beyond a reasonable doubt was improper and constitutes reversible error. The point is raised as plain error before us since defense counsel did not object to the charge at trial. He focuses on the court's definition of reasonable doubt, which cautioned the jurors against viewing the State's evidence with skeptical minds

or "ignoring" an interpretation of the evidence that might favor the State or searching for doubt instead of the truth. Defendant argues that the charge inflated the degree of doubt that would qualify as reasonable, suggesting that the jurors must be more than skeptical about the State's case. In the defense view, the charge narrowed the circumstances that would have entitled defendant to have the benefit of a reasonable doubt and placed inferences consistent with guilt on an equal footing with inferences consistent with innocence.

Taken in the abstract, the challenged portions of the charge may have that tendency. However, we have repeatedly stated that " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.' " *State v. Marshall, supra,* 123 *N.J.* at 135, 586 *A.*2d 85 (quoting *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973)). Our review of the court's charge to the jury convinces us that its overwhelming tenor was to convey to the jury that the State bore the burden of proof beyond a reasonable doubt on each and every element of the case.

While telling jurors "to search for the truth," the court, in the same sentence, told them "to give the defendant the benefit of a reasonable doubt, if it arises in your mind, after you have considered all of the evidence in the case." In addition, the court correctly charged the jury on the presumption of innocence and on the State's burden of proof. Furthermore, the State's burden of proving each element of each offense beyond a reasonable doubt was restated without qualification in the context of the separate instructions concerning the various charges in the indictment, so that "[t]he concept of the State's burden to prove guilt beyond a reasonable doubt permeates the trial court's jury charge." *State v. Marshall, supra,* 123 *N.J.* at 136, 586 *A.*2d 85.

Nonetheless, we repeat the admonition that we expressed in *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130

(1987), in which we cautioned our trial courts against using any charge that has a tendency to " 'understate' " or " 'trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt.' " *Id.* at 41, 524 *A.*2d 130 (quoting *Commonwealth v. Ferreira,* 373 *Mass.* 116, 364 *N.E.*2d 1264, 1272 (1977)). Any instruction that suggests that the concept of reasonable doubt is a simple search for truth may run the risk of detracting from both the seriousness of the decision and the State's burden of proof. Because the degree of certainty required to convict is unique to the criminal law, we discourage the resort to any language that tends to minimize the indispensable nature of the reasonable doubt standard.

We are satisfied that the trial court's clear statement of the presumption of innocence and its repeated emphasis on the continuing burden of proof on the State with respect to each of the individual charges fully and accurately apprised the jury of the State's burden of proof beyond a reasonable doubt. Read in their entirety, the challenged portions of the charge do not constitute grounds for reversal of the convictions.

## IV

We advert only briefly to other issues that we have considered and disposed of without further discussion. The introduction into evidence of photographs of the decomposed body of the victim was within the discretion of the trial court. There was sufficient evidence to submit to the jury the hindering-apprehension charge. The trial court's charge to the jury concerning the definition of reasonable doubt did not unnecessarily dilute the State's burden of proof or deprive defendant of due process of law.

In respect of sentencing-phase errors charged, we do not address those except to note that the prosecutor should not have appealed to jurors to "have the courage" to vote for death. *See State v. Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058

(prosecutor should not divert jury "from its duty to determine defendant's punishment based on the evidence and in accordance with the trial court's charge"). The trial court should carefully explain the mitigating factors. *State v. Bey*, 112 *N.J.* 123, 169, 548 *A.*2d 887 (1988) (*Bey* II). The court did not err in failing to sequester the jury during its penalty-phase deliberations. Our disposition makes it unnecessary to undertake the proportionality review requested by defendant under *N.J.S.A.* 2C:11–3e. We have considered whether any departure should be made from our prior rulings on the constitutionality of the death penalty in New Jersey and have concluded that no departure is warranted. The trial court did not err in denying defendant's motion for post-trial questioning of the jurors.

## V

To sum up, defendant has been found guilty of murder. Defendant may not be sentenced to death without having a jury make the choice between all available verdicts of capital and non-capital murder. In this case, the State affirmed that the murder had been committed in the course of a felony. Despite that affirmance by the State, the jury was not allowed to deliberate on the non-capital verdict of felony murder. There is no substitute for a jury verdict on this essential question of death-eligibility. The death sentence must be vacated because the State did not afford the defendant this fair-trial right.

To explain the reasons why a free society should elect to afford fair-trial rights to even the seemingly most reprehensible of its members remains difficult. Justice Frankfurter once wrote that "[l]aw triumphs when the natural impulses aroused by a shocking crime yield to the safeguards which our civilization has evolved for an administration of criminal justice at once rational and effective." *Watts v. Indiana*, 338 *U.S.* 49, 55, 69 *S.Ct.* 1347, 1350, 93 *L.Ed.* 1801, 1807 (1949). That answer may not be enough for those who regard society as the loser when these safeguards produce unpalatable results. Per-

haps it is only the experience of an unjust system of laws, as has occurred in other parts of the world, that will nurture respect for law.

Except with respect to death-eligibility, the convictions of murder and other counts are otherwise affirmed and the matter remanded to the Law Division for proceedings in accordance with this opinion.

HANDLER, J., concurring in part and dissenting in part.

In this capital-murder case, Braynard Purnell received a death sentence because the murder he committed occurred in the course of a robbery. The central question, as recognized by the Court, is whether a death sentence can be imposed on that ground when the jury failed to determine whether defendant was guilty of the substantive crime of felony murder. I agree with the Court that a death sentence imposed under such circumstances is "constitutionally defective," *ante* at 523, 601 *A.*2d at 177, and that the defendant's conviction for capital murder and his death sentence must be reversed. However, I disagree with the Court's decision to leave intact defendant's conviction for non-capital murder. I believe that a capital prosecution that relies ultimately on the existence of felony murder as a basis for the death sentence but withholds from the jury the determination of the defendant's criminal guilt for that substantive crime is fundamentally flawed, and, in this case, warrants reversal of the defendant's murder conviction. I dissent from the Court's refusal to take that step.

The Court also notes other issues on the appeal that it has considered and "disposed of without further discussion," *ante* at 546, 601 *A.*2d at 188, or found moot in light of its resolution of the felony-murder issue and vacation of the death sentence. *Ante* at 534, 601 *A.*2d at 182. In my view some of those issues bear weightily on the validity not only of defendant's death sentence but of his murder conviction as well, and merit further treatment. Additionally, I reiterate my continuing belief that

the capital-murder statute remains unconstitutional as enacted, interpreted, and applied. *E.g., State v. Marshall*, 123 *N.J.* 1, 214, 586 *A.*2d 85 (Handler, J., dissenting).

## I

The State's theory of the capital-murder case against defendant was that he killed Lawrence Talley while robbing him of cocaine. Indeed, the State was unwavering in that position. Prior to trial, the State served defendant with a notice of aggravating factors. In addition to specifying a prior murder conviction as an aggravating factor, the State indicated that it intended to seek the death penalty for the murder based on aggravating factor *N.J.S.A.* 2C:11–3c(4)(g), specifically, that "[t]he offense was committed while the defendant was engaged in the commission of, or attempt, or flight after committing or attempting to commit ... robbery...." The prosecutor in his opening statement at the guilt phase of the trial told the jury that defendant had gone into his backyard with Talley in order "to obtain cocaine from" him. The prosecutor noted that "apparently the defendant did not have quite enough money for what Lawrence Talley wanted to charge him for this cocaine" and that "it seemed this defendant was going to get this cocaine no matter what." The prosecutor also told the jury: "He [Talley] didn't have any quantity of cocaine on his body. I submit it was removed from him by the defendant and used later on that night. He [the victim] didn't have any cash on him. They just found a quarter underneath his body...." During his guilt-phase summation, the prosecutor stated that Talley had been carrying approximately two "sixteenths" of cocaine on the evening of August 26, about the same amount that defendant took to Marie Simmons's home later that night, and emphasized that "[t]wo sixteenths of an ounce of cocaine is not something you pull out of the air, ladies and gentlemen." That position was reiterated in the penalty phase of the trial. The prosecutor told the jury that he would let it decide "whether this defendant took Lawrence Talley's drugs when he killed

him," but that in his opinion the evidence supporting both aggravating factors was "absolutely crystal clear." Consistent with the State's position, the trial court gave the jury sentencing instructions for determining the occurrence of robbery in support of the c(4)(g) factor. The trial court stressed: "you've heard the elements of what robbery is and the State has to prove beyond a reasonable doubt that the murder was committed while Purnell was engaged in the commission of or attempting to commit robbery as I have defined it."

Thus, although the State's theory was that defendant had killed Talley in the course of a robbery, and it relied on that factor in obtaining a death sentence, defendant was never indicted for robbery, and the jury was never given the opportunity to determine whether defendant was criminally guilty of either robbery or felony murder based on robbery. According to the trial court's explanation to the jury, "the law does not prevent the State from alleging robbery as an aggravating factor just because they did not include it as a Count in the Indictment." The Court, in my view, correctly rejects the trial court's position.

The Court very aptly points out that the State's failure to indict defendant for the predicate felony here does not obviate the trial court's obligation to submit the felony murder to the jury for a determination of substantive guilt during the guilt phase of the trial. *Ante* at 532–533, 534, 601 *A.*2d at 182, 187. See *State v. Dixon*, 125 *N.J.* 223, 593 *A.*2d 266 (1991) (acknowledging the duty of trial courts to charge the jury "concerning any version of the offense 'clearly indicated' by the evidence" (quoting *State v. Grunow*, 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986)). That duty is imperative when the lesser-included, or alternative, offense is a form of non-capital murder, such as felony murder. The failure to charge such non-capital offenses "would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck v. Alabama*, 447 *U.S.* 625, 637, 100 *S.Ct.* 2382, 2389, 65 *L.Ed.*2d 392, 402 (1980). In

this context, the Court also properly rejects the State's additional argument that there was no reversible error because another form of non-capital murder, serious-bodily-injury murder, was submitted to the jury and the jury still convicted defendant of capital murder. The submission of a different form of non-capital murder, which the jury rejected, did not obviate the need to submit felony murder in this case. Where no one witnessed the homicide, so that the exact circumstances of the homicide remain unclear, the jury should be presented with the complete range of non-capital crimes supported by the evidence in order to enable it to make a fair determination of defendant's guilt. *State v. Hunt*, 115 *N.J.* 330, 407, 558 *A.*2d 1259 (1989) (Handler, J., dissenting) (the jury should not be "deprived of the full spectrum of choices on which to base its weighty determination of criminal liability, denying the defendant the opportunity to secure a conviction on a less serious offense").

The failure to require the jury in the guilt phase of the trial to consider defendant's substantive guilt of the crime constituting felony murder created another profound flaw in this case. Because the jury, when sentencing defendant, had not been given the antecedent opportunity to consider the substantive crime within the traditional framework for determining criminal guilt or innocence, it could determine the defendant's guilt for the underlying felony only *at the same time* that it determined his sentence. That, I submit, is contrary to the teachings of *Furman v. Georgia*, 408 *U.S.* 238, 309–10, 92 *S.Ct.* 2726, 2762–63, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring); *id.* at 310–12, 92 *S.Ct.* at 2762–64, 33 *L.Ed.*2d at 390–91 (White, J., concurring) and *Gregg v. Georgia*, 428 *U.S.* 153, 189–92, 96 *S.Ct.* 2909, 2932–34, 49 *L.Ed.*2d 859, 883–85 (1976).

Assessing guilt and assessing punishment require two very distinct types of thinking by the jury. The determination of the commission of a crime that constitutes a guilty verdict is the *ultimate* decision of the jury. In contrast, the determination of the commission of a crime that is only a sentencing factor is not

the ultimate decision that the jury must make—that decision is whether the defendant lives or dies. In the capital sentencing context, when the jury determines that the defendant has committed an "offense," that determination is only one factor among many to be simultaneously decided and weighed in fixing an ultimate sentence. Hence, the jury's finding of the c(4)(g) aggravating factor based on the commission of an offense cannot be regarded as qualitatively equivalent to a final verdict that the defendant is criminally guilty of that offense.

The failure to have the jury render a verdict on felony murder generated another form of unfairness to defendant. By that failure the trial court exposed to the death penalty a defendant whose candidacy for the death sentence had not been previously determined with all of the constitutional protections that must surround that process. Because the prosecution was permitted to prove the felony in the sentencing phase rather than the guilt phase, it was able to bolster its proof of the robbery with evidence not normally admissible to prove criminal guilt, such as character evidence, evidence of a prior murder, and, most importantly, the fact that the jury had just convicted defendant of intentional murder.

One might argue that the State must prove more in order to establish a felony as a sentencing factor than to prove the felony as an element of the substantive crime of felony murder, in that capital murder requires proof of intent to kill and felony murder does not. Technical or formal requirements of proof aside, the jury that is called on to find a felony only as a sentencing factor does so after it already has concluded that the defendant has committed an intentional murder and is death eligible. Such a finding, by itself, is bound to make the jury more inclined to believe that the defendant committed a felony. See *State v. Simon*, 79 *N.J.* 191, 201, 398 *A.*2d 861 (1979) (jury that is first permitted to determine a factor relating to guilt may be prone to determine that defendant is guilty of substantive crimes). Consequently, a capital defendant unquestionably has greater procedural protection if the jury must determine

whether he or she is guilty of the felony as a substantive crime before it commences capital sentencing deliberations.

No defect is more grave in a capital-murder prosecution than one that merges and blurs the jury's determination of criminal guilt with its imposition of the death sentence. A procedure that calls on the jury to determine as a part of a single decisional process both that the defendant is criminally guilty and that he or she deserves to die is unprincipled and unconstitutional. That potential inheres generally in our current capital-murder statute because, I believe,

> the jury's consideration of aggravating factors serves both to specify which defendants are in the class [of murderers who are death-eligible] and, in the same process, to decide their punishment. The aggravating factors act as specifications of the class; they form, in effect, elements of the offense defendants must have committed to come within the class.

> *        *        *        *        *        *        *        *

> Aggravating circumstances are used in determining who among the class of all murderers is death-eligible. In this sense, these factors define the elements of capital murder. The factfinding necessary to determine if the murder is *capital* murder occurs in the sentencing rather than the guilt phase; moreover, the identical factfinding is necessary to determine if the murder is to be punishable by *death*. Thus, in the same process that the jury considers aggravating factors to determine if the murder is capital murder, it also must use the aggravating factors to determine if the sentence is death.

> [*State v. Ramseur, supra,* 106 *N.J.* at 393, 402, 524 *A.*2d 188 (Handler, J., dissenting) (citation omitted).]

If the point—that the guilt and sentencing determinations are not sufficiently separated under our capital-murder methodology—is otherwise fairly debatable, as the majority opinion in *Ramseur* suggested, *id.* at 192–95, 398 *A.*2d 861, it is hardly debatable in this case. Here, the *only* determinations of guilt with respect to the commission of a felony and felony murder were made as elements of the decision to impose the death sentence.

An additional aspect of prejudice arises whenever the trial court allows the State to splinter the jury's determination of criminal activity, as it does when the jury in a capital case considers the occurrences of different crimes independently in

the guilt and penalty phases of the trial. Such a practice denies the defendant the opportunity to have the jury evaluate the overall level of his or her culpability stemming from all related acts taken together. A jury verdict of criminal guilt is supposed to express an ultimate judgment of culpability that encompasses the consideration of the evidence, the determination of basic facts, and the application of legal principles that define the substantive crime and guide the jury in its special responsibility for determining criminal guilt. *E.g., State v. Ingenito*, 87 *N.J.* 204, 432 *A.*2d 912 (1981). We have recognized that the jury's criminal verdict may be an expression of conscience, *e.g., id.* at 212, 432 *A.*2d 912; *see State v. Dunne*, 124 *N.J.* 303, 319, 590 *A.*2d 1144 (1991), through which the jury may exercise lenity and find a defendant innocent in spite of evidence that establishes criminal guilt beyond a reasonable doubt. *E.g., State v. Ingenito, supra*, 87 *N.J.* at 212, 432 *A.*2d 912.

Criminal sentencing involves as profound a responsibility and expression of conscience as determination of criminal guilt or innocence. Indeed, the jury's sentencing responsibility in a capital-murder case is even more awesome than its responsibility for determining criminal guilt. That does not mean, however, that the defendant can be deprived of the right to be tried for all of his or her criminal acts at once. Each kind of judgment by the jury reflects a final judgment that is something more than the sum of its constituent parts. *State v. Simon, supra*, 79 *N.J.* at 203, 398 *A.*2d 861.

Courts appreciate that neither of these two types of jury determinations can be explained solely by reference to the separate factors that bring the jury to its ultimate conclusion. These determinations can transcend their separate elements. Thus, with respect to criminal verdicts, courts do not insist on rigid or logical consistency among verdicts having common elements. *E.g., State v. Ingenito, supra*, 87 *N.J.* at 212, 432 *A.*2d 912. Nor do courts permit a jury's verdict in one proceeding to be substituted or adopted for use in another. *Id.* at 217, 432 *A.*2d 912. Because courts can never be sure how a jury

may transform a decisional factor into an ultimate determination of guilt, courts do not excuse a jury from making an independent finding with respect to each essential element that is a part of its verdict even when that element is undisputed. *E.g., State v. Collier*, 90 *N.J.* 117, 447 *A.*2d 168 (1982). Most especially, in a capital case the jury reconsiders all of the evidence from a fresh vantage point when deciding on a sentence, and may disregard the prior factual determinations reached during the guilt phase of the trial. *See State v. Biegenwald*, 106 *N.J.* 13, 72, 524 *A.*2d 130 (1987) (when a capital defendant receives a new trial for the purposes of sentencing, "neither side is assured, at the new trial, of the 'benefits' gained in the original trial."). The jury may not satisfy its obligation to determine whether defendant has committed a felony as an element of an aggravating factor for capital-sentencing purposes simply by adopting its antecedent determination of criminal guilt.

In this case, the trial court implicitly acknowledged that the finding of the commission of an offense as a sentencing factor is not the same kind of ultimate determination as that of criminal guilt, and indeed, by its instructions, may have trivialized the jury's decisional responsibility with respect to determining whether defendant committed a robbery as a sentencing factor, *viz:*

> [Y]ou have to know *a little* about what robbery is so you can determine from all the evidence that you heard during the entire trial, the guilt phase and now, whether or not that aggravating factor has been proven by the State beyond a reasonable doubt. (Emphasis added)

The failure to indict or otherwise charge defendant for the underlying predicate felony of c(4)(g) constitutes a form of undercharging. In the context of a capital prosecution, undercharging allows the defendant to be punished for a crime without a formalized jury determination of his or her guilt for that crime. Indeed, the failure to indict or charge the predicate felony deprives the defendant of the opportunity to secure an acquittal of that crime. *See People v. Mitchell*, 64 *A.D.*2d 119,

408 *N.Y.S.*2d 513, 518 (1978) (defendant's conviction for felony murder reversed because jury, while finding defendant guilty of felony murder, had acquitted him of the underlying felony); *see also State v. Dixon, supra,* 125 *N.J.* at 264, 593 *A.*2d 266 (defendant acquitted of robbery could not be subjected to the c(4)(g) aggravating factor based on robbery).

While concluding in this case that defendant should have been charged with felony murder, the Court, nevertheless, suggests in *dictum* that under other circumstances offenses that are both substantive crimes and elements of an aggravating factor need not be the subject of an indictment or charged or submitted to the jury for a determination of criminal liability. It observes:

> Obviously, our Legislature did not intend, nor does constitutional principle require, that every aggravating factor under *N.J.S.A.* 2C:11–3c that renders a murder death-eligible be the subject of an indictment and a guilt-phase verdict. For example, although factors c(4)(f), killing to escape detection, and factor c(4)(h), killing a police officer, can constitute separate criminal offenses, neither principles of constitutional law nor of fundamental fairness require that the factors be tried as separate indictable offenses in the guilt phase. If proper notice were given, the sentencing-phase jury could make its unanimous finding of such a factor without a prior guilty verdict and without unfairness in the trial.
>
> [*Ante* at 533, 601 *A.*2d at 182.]

The Court expresses concern about possible unfairness to a defendant that might result if the predicate offense or felony were required to be charged as a substantive crime. That concern was also mentioned in *State v. Dixon, supra,* 125 *N.J.* at 264, 593 *A.*2d 266. There the predicate felony and felony murder, specifically, robbery and felony murder in the course of robbery, were in fact charged, and the jury acquitted the defendant of those charges. During deliberations, the jury had asked whether they could find the defendant guilty of felony murder based on a felony other than robbery. The trial court had responded that robbery is "the only felony that you address your attentions to." The Court rejected the defendant's argument on appeal that when there is some evidence of a sexual attack on the victim, the trial court in the guilt phase of the

trial should charge felony murder predicated on attempted sexual penetration, even when the defendant has not requested such a charge. *Id.* at 256, 506 *A.*2d 708. The Court explained:

[T]he trouble with the analysis in a case like this, in which defendant did not request such a charge, is that it puts the court in an impossible position. Defendant was not charged with sexual penetration or attempted sexual penetration. What if the jury had convicted defendant of intentional murder and then had premised a sentence of death on an attempted sexual penetration, viewed as an aggravating factor? We could well envision that if the court on its own motion had submitted this felony to the jury and the jury had not only found attempted sexual penetration but predicated a death sentence on it, what a troublesome issue it would be to review on appeal.

[*Ibid.*]

I submit that the hypothetical posed by the Court in *Dixon* and repeated in this case cannot arise. If the State has not previously specified the particular offense in its notice of aggravating factors as a predicate felony, it may not rely on that offense to support a death penalty regardless of the evidentiary support underlying the offense. The defendant has a constitutionally-founded right to be served in advance of trial with a notice of aggravating factors and to challenge those factors. *See State v. Matulewicz,* 115 *N.J.* 191, 195–96, 557 *A.*2d 1001 (1989); *State v. McCrary,* 97 *N.J.* 132, 478 *A.*2d 339 (1984). The defendant's entitlement as a matter of constitutional due process and fundamental fairness to a charge on a non-capital form of murder cannot be conditioned on his or her relinquishment or waiver of the right to be served with a notice of aggravating factors that governs whether the death sentence may be sought and that determines and limits the scope of the sentencing-phase of the trial.

It is not a mere coincidence that in all of New Jersey's previous capital-murder cases in which the State submitted the c(4)(g) factor, the defendant had been indicted for and convicted of the underlying felony. See *State v. Moore,* 122 *N.J.* 420, 585 *A.*2d 864 (1991); *State v. McDougald,* 120 *N.J.* 523, 577 *A.*2d 419 (1990); *State v. Hightower,* 120 *N.J.* 378, 577 *A.*2d 99 (1990); *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816 (1990); *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988); *State v. Bey*

*II,* 112 *N.J.* 123, 548 *A.*2d 887 (1988); *State v. Bey I,* 112 *N.J.* 45, 548 *A.*2d 846 (1988). These decisions reflect the understanding that if evidence is sufficient to support the aggravating factor c(4)(g), it must be sufficient to support and warrant an indictment for the substantive felony that constitutes the basis for that aggravating factor.

As earlier noted, the Court determined that the consequence of the failure to charge defendant with felony murder in the guilt phase of the trial is that defendant's death sentence must be vacated and his conviction for capital murder reversed. *Ante* at 532–533, 601 *A.*2d at 181–182. I would set aside the conviction for non-capital murder as well.

The Court explains that "[b]ecause we have vacated the death sentence ... there is, in the present posture of the case, no other prejudicial effect prior to a capital retrial." *Ante* at 543, 601 *A.*2d at 187. Only "[i]f the State seeks a sentence of death" must the murder conviction be vacated and the murder count retried. *Ibid.* It finds some support for this uncertain disposition in *State v. Dixon,* where it said: "Because the sentence for felony murder is the same as the sentence for knowing or purposeful murder where the death penalty is not imposed, there is no prejudice to defendant in the circumstances of this case". 125 *N.J.* at 256, 506 *A.*2d 708.

Underlying the Court's disposition appears to be some notion or construct of contingent future prejudice. The Court assumes that if, in the future, defendant is not exposed to the death sentence, it does not matter whether he is guilty of felony murder or some other form of non-capital murder because the penalties are the same. It is simply wrong, however, to conclude that because the *sentences* for non-capital murder and felony murder are the same, the *convictions* for those respective murders are the same. Homicides are not fungible. Though the sentence for felony murder is the same as the sentence for intentional murder, the offenses are defined differently and the stigma attached to the former is smaller. The

defendant is constitutionally entitled to have the jury consider all possible forms of homicide rationally supportable by the evidence in order to determine which kind of homicide he or she has committed. *State v. Rose*, 112 *N.J.* 454, 552, 548 *A.*2d 1058 (1988) (Handler, J., dissenting). In this case the options should include not only intentional murder but all forms of manslaughter, including passion/provocation manslaughter, see discussion, *infra* at 534–536, 601 *A.*2d at 182–183, as well as noncapital murder, including felony murder. In the absence of a charge for felony murder there can be no confidence in the soundness of the jury's determination of criminal guilt.

In sum, the significant concern in this case is that the jury's determination that defendant committed a robbery as an "offense" for sentencing purposes may not have been as fairly-informed and soundly-based as would have been a jury's verdict that defendant was guilty of the substantive crime of robbery. I am thus persuaded that the serious defects inherent in the failure to have the jury determine substantive guilt of robbery and felony murder prior to its initiating deliberations on the death sentence require vacation of defendant's non-capital murder conviction, as well as his conviction for capital murder and his death sentence.

## II

Although the trial court charged the jury with the lesser-included offenses of aggravated manslaughter and reckless manslaughter, it did not charge passion/provocation manslaughter. Defendant argues that passion/provocation manslaughter should have been charged. I agree.

The evidence presented supports a charge of passion/provocation manslaughter. There was no indication that defendant had any intention to kill the victim prior to the unravelling of the drug transaction. According to the prosecution, defendant had only $114 to purchase a "16th" of cocaine, while the victim wanted $120, even though the market value in the street was

only $80–85 for that amount of cocaine; as the two men proceeded toward defendant's house, they were heard having a "loud conversation" or a "loud argument"; at approximately 9:00 p.m., defendant's daughter, Dia Shaw, telephoned the police to report that "two guys are jumping my dad," and at trial, she testified that she saw her father grappling with another man; Marie Simmons testified that when defendant arrived at her house later that evening, she noticed "a scar on his arm, a cut that was oozing blood"; James Berry, who was also at Ms. Simmons's house that night, testified that defendant had a "bruise right underneath his eye"; Charlotte Talley testified that when she saw defendant on Sunday, August 28, 1989, he had "this big black and blue mark on his face," and a mark on his arm; Investigator Ronald Morgan testified that on August 28th, he observed an open "puncture wound, a round-type wound" on Mr. Purnell's upper arm by his bicep.

The Court views "that evidence skeptically," *ante* at 541, 601 A.2d at 186, but concludes that even considered "in the light most positive to defendant, that evidence does not clearly indicate the appropriateness of a passion/provocation charge." *Id.* at 542, 601 A.2d at 186.

In my view, the record provides adequate evidence to suggest that the victim started the fight or the parties engaged in mutual combat. The evidence of defendant's wound was developed and relied on by the State itself. Since the record does not reveal precisely when or how the wound was sustained, its very existence provides a rational basis for a jury to conclude that the killing constituted a passion/provocation homicide. It surpasses the level of evidence that this Court found to be sufficient in *State v. Mauricio*, 117 *N.J.* 402, 568 A.2d 879 (1990). In *Mauricio*, the victim was seen attacking the defendant twenty minutes prior the incident that ended in the victim's death. *Id.* at 414, 568 A.2d 879. In this case, unlike *Mauricio*, witnesses saw persons attacking the defendant at the start of the same encounter that ended in the victim's death. Particularly in a capital-murder prosecution, such evidence must be

viewed to the end that the jury is given a complete choice of possible types of homicide to assure that its factual determinations based on the evidence and its application of the law are as comprehensive, complete, and fair as possible. Although the majority seems to accept this principle with respect to the crime of felony murder, it ignores it with respect to the crime of passion/provocation manslaughter.

## III

Defendant urges as plain error that the trial court applied a legally incorrect standard for excusing death-scrupled jurors. Pointing to the *voir dire* of four particular jurors, he argues that the court qualified only those jurors who "unequivocally indicated that [they] would impose the death penalty" and excluded without meaningful follow-up questioning those who had expressed doubts about their ability to impose death. According to defendant, those jurors might well have been death qualified, albeit more reluctant to impose the death penalty than the jurors eventually chosen. The Court dismisses those contentions. *Ante* at 534–535, 601 *A.*2d at 182–183.

This Court has stressed repeatedly that the use of open-ended questions is an "important ingredient" in the process of juror death-qualification. *Williams* II, 113 *N.J.* 393, 413, 550 *A.*2d 1172 (1988). Here, however, death-qualification assumed a pattern typical of recent cases: an initial open-ended question on a juror's thoughts on the death penalty followed by a series of leading, closed-ended questions seemingly calculated to elicit a "correct" response. *See State v. Biegenwald,* 126 *N.J.* 1, 39, 594 *A.*2d 172 (1991) (*Biegenwald* IV) ("The court's initial open-ended question and variations on the 'it depends' response were too often followed by closed-ended, suggestive questions that, not surprisingly, elicited the obvious 'correct' response."); *State v. Dixon, supra,* 125 *N.J.* at 271, 593 *A.*2d 266 (Handler, J., dissenting and concurring).

At the beginning of each day of jury selection, the trial court oriented the jury on New Jersey's death-penalty statute, providing examples of aggravating factors and describing the weighing of aggravating and mitigating factors. Prospective jurors then completed written questionnaires that solicited information on jurors' family, employment, familiarity and experience with courts and the criminal justice system, knowledge of the case or any participants therein, ability to be impartial in a variety of situations, and ability to follow the law. During individual *voir dire*, the court probed into troublesome responses (or non-responses) on the questionnaire. It then asked several closed-ended questions respecting a juror's ability to impose the death penalty. Many of these included purely hypothetical situations based on statutory aggravating factors such as a prior murder, a murder of a police officer, or a murder for hire, as well as a case involving drugs. The court also asked jurors about their ability to be impartial in light of a notorious incident in which the former Camden County Prosecutor resigned after having fabricated a story of a criminal assault on himself. Those questions were precisely the sort of leading, closed-ended questions we have disapproved in our prior cases.

The *voir dire* also reveals an overemphasis on jurors' ability to follow a mechanical weighing process, to the neglect of other reasoning skills that capital sentencing requires. The trial court typically asked jurors whether they could impose the death penalty if they found the existence of an aggravating factor and concluded that it outweighed all mitigating factors beyond a reasonable doubt. On receiving an affirmative response, the court then referred to hypothetical aggravating factors to see if a particular aggravating factor would change the process used by the juror to determine what penalty would be imposed (*i.e.*, whether the juror would still weigh the factors or would automatically vote one way or another). The court typically referred to the three hypothetical aggravating factors—a prior murder conviction, murder for hire, and mur-

der of a policeman—to see whether any would affect the juror's decision-making process.

Significantly, the court did not question jurors about the so-called "felony murder" aggravating factor that actually was present in this case. Had it done so, it might have found other jurors who could not engage in the weighing process fairly. *See State v. Biegenwald IV, supra,* 126 *N.J.* at 32, 594 *A.*2d 172 (*"voir dire* should include questioning about evidence of aggravating factors that will be presented during the sentencing proceeding and that may with reasonable likelihood have such an effect on a prospective juror as to render him or her 'substantially impaired' under the *Adams–Witt* standard.").

Only one of the three hypothetical aggravating factors was present in this case, namely, a prior murder conviction. The court, however, did not ask jurors to consider the effect of the prior-murder-conviction aggravating factor alone. Hence, court and counsel could not winnow out jurors who could not fairly weigh that aggravating factor. We indicated in *Biegenwald IV* that when that factor is present in a capital-murder prosecution, it must be addressed in the juror death-qualification process. 126 *N.J.* at 31, 594 *A.*2d 172. That requirement could, in turn, impel the impanelling of two juries if necessary. *Id.* at 43–44, 594 *A.*2d 172. We did not suggest, nor could we approve, a *voir dire* in which the existence and significance of that aggravating factor could be glossed over or obscured.

## IV

At the close of the guilt phase, the trial court instructed the jury with respect to the presumption of innocence and burden of proof. It told the jury that "[w]hile it is your duty to give the defendant the benefit of every reasonable doubt, you're not to search for doubt. You are to search for the truth." The court added: "your sole interest is to ascertain the truth from all the evidence that's in the case that you've heard." The court also advised the jury that "a reasonable doubt is not a

doubt which is merely fanciful or speculative that one with a skeptical mind might produce." It further instructed the jury that "a doubt which ignores a reasonable interpretation of the evidence ... is not a reasonable doubt." These instructions were improper, for they implied that the jury could convict the defendant if the State's theory was reasonable and more likely true than not. Although it used the phrase "beyond a reasonable doubt," the court defined that phrase so as to render it indistinguishable from a mere preponderance-of-the-evidence standard.

Concededly, as this Court has often stated, " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation' " and "the charge should be examined as a whole to determine its overall effect." *State v. Marshall, supra,* 123 *N.J.* at 135, 586 *A.*2d 85 (quoting *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973)). Thus in *Marshall,* this Court held that the trial court's exhortation to the jurors that their verdict should "declare the truth," given at the end of otherwise correct instructions, was not reversible error. *Id.* 123 *N.J.* at 136, 586 *A.*2d 85. Similarly, in *State v. Hunt, supra,* 115 *N.J.* at 372, 558 *A.*2d 1259, the defendant contended that the trial court had diluted the State's burden of proof by instructing the jury that it had a duty to determine "where the truth rests." This Court rejected the defendant's argument, noting that the defendant had failed to object below, and that the trial court had provided detailed instructions to the jury on the State's burden to prove the defendant's guilt beyond a reasonable doubt. Thus, "[l]ooking at the charge in its entirety, there was no error." *Id.* at 373, 558 *A.*2d 1259. In *State v. Biegenwald,* 106 *N.J.* 13, 41, 524 *A.*2d 130 (1987), the trial court told the jury that the concept of reasonable doubt "is very basic and really very simple." This Court admonished trial courts not to "understate[ ]" or "trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt." *Ibid.* (quoting *Commonwealth v. Ferreira,* 373 *Mass.* 116, 364 *N.E.*2d 1264, 1272 (1977)). The Court held,

however, that when "[r]ead in context[,] the challenged portion does not constitute error." *Id.* at 43, 524 *A.*2d 130. It noted that the trial court had defined reasonable doubt correctly and had made other comments, ensuring that the jury was fully and accurately apprised of the State's burden of proof. *See also State v. Clausell,* 121 *N.J.* 298, 332–35, 580 *A.*2d 221 (1990) (court's charge on reasonable doubt, when read in its entirety, was more than adequate).

Here, as noted, portions of the charge both improperly defined a reasonable doubt as "[a] doubt which ignores a reasonable interpretation of the evidence," *and,* at the same time, exhorted the jury to "search for the truth." Moreover, other aspects of the charge accentuated the admonition that "truth" could be a critical determinant of guilt. Thus, the court told the jury that "[y]ou and you alone decide which of the *facts that you've heard are correct*" and that "[t]he credit and belief for the defense must be determined by you and you alone." (Emphasis added).

As a general proposition such instructions may be constitutionally permissible if given as part of a lengthy charge that is reasonably accurate and complete when viewed as a whole. *See Marshall, supra,* 123 *N.J.* at 136, 586 *A.*2d 85. In a capital case, however, we cannot afford to be so indulgent. The strictures of fundamental fairness command more exacting and punctilious scrutiny of jury instructions to discern the potential to confuse. In the context of a capital-murder prosecution, it is essential that the trial court's instructions be reviewed meticulously to determine whether any statement, singly or with others, was incorrect and sufficient to create a risk of misleading the jury on a fundamental aspect of its responsibilities. Here there were mistaken communications and they did carry that risk.

## V

For the foregoing reasons, I concur in part and dissent in part from the judgment of the Court.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Concurring in part and dissenting in part*—Justice HANDLER—1.